**COFACREDIT, S.A., Plaintiff–Appellee,**

v.

**WINDSOR PLUMBING SUPPLY CO. INC.; Windsor World, Inc.; Sholam Weiss; Moshe (Moses) Weiss; Hersch (Heshy) Lipszyc; and Holleville Et Duverger U.S.A., Inc., Defendants–Appellants,**

**Societe Industrielle Et Commerciale Holleville Et Duverger and Erich Brandli, Defendants.**

**Docket No. 96–9302**

United States Court of Appeals, Second Circuit.

Argued: March 30, 1998

Decided: Aug. 3, 1999

Lawrence S. Hirsh, New York, NY, (Leo Fox, Reid & Priest, New York, NY, of counsel) for Defendants–Appellants.

\* The Honorable Warren W. Eginton, Senior Judge of the United States District Court for the District of Connecticut, sitting by designation.

\*\* The Honorable I. Leo Glasser, Senior Judge of the United States District Court for the Eastern District of New York, sitting by designation.

Kathleen M. Kundar, New York, N.Y. (Carl L. Distefano and Oleg Rivkin, Fox & Horan, New York, NY, of counsel) for Plaintiff–Appellee.

Before: PARKER, Circuit Judge, and EGINTON\* and GLASSER,\*\* District Judges.\*\*\*

PARKER, Circuit Judge:

Defendants–Appellants Windsor Plumbing Supply ("Windsor"), Windsor World, Inc. ("Windsor World"), Sholam Weiss, Moshe Weiss, Hersch Lipszyc, and Holleville et Duverger U.S.A. ("HED–US") (collectively, the "Windsor Defendants") appeal from a judgment, entered in the Eastern District of New York (Sterling Johnson, Judge) following a three week bench trial.

The district court found in favor of Plaintiff–Appellee Cofacrèdit, S.A. ("Cofacrèdit") on claims of common-law fraud and conspiracy, and substantive and conspiracy violations of the civil Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961–68, against the Windsor Defendants, as well as Erich Brandli and Sociètè Industriale et Commerciale Holleville et Duverger ("HED–France") (collectively, with the Windsor Defendants, the "Defendants"). Cofacrèdit's claims arose out of an alleged scheme whereby the Defendants obtained financing from Cofacrèdit and others based on fraudulent invoices. In accordance with its findings, the district court entered judgment for Cofacrèdit in the amount of $5,123,196, a sum which included treble damages under RICO and an award of pre-judgment interest. The district court

\*\*\* Pursuant to 28 U.S.C. § 46(b) and an order of Chief Judge Ralph K. Winter certifying a judicial emergency, this case was heard by an emergency panel consisting of one judge of this Court, and two judges of the United States District Court sitting by designation.

also awarded Cofacrèdit costs and attorney's fees.

On appeal, the Windsor Defendants argue that the district court erred in finding them liable for the common-law and civil RICO violations. They also challenge the court's award of pre-judgment interest.

## I. BACKGROUND

### A. *Parties*

Cofacrèdit is a French financial concern which provides various financial services to French manufacturers engaged in selling goods abroad. These services include factoring the manufacturers' invoices. Factoring is a form of financing that allows a manufacturer to obtain immediate payment for the goods it sells even though the buyer is not obligated to pay for those goods until the conclusion of a credit period, usually months after the sale. As soon as the manufacturer ships goods to a buyer, the factor pays the manufacturer the purchase price evidenced by the invoice. In return, the factor obtains the right to receive payment on the invoice from the buyer at the conclusion of the credit period, as well as the right to collect related expenses from the manufacturer. As a condition of factoring invoices, a factor may require the manufacturer to guarantee the invoices against non-payment should the buyer become insolvent. The manufacturer can provide this guarantee by obtaining credit insurance. In order to guarantee that it would receive payment on the invoices it factored, Cofacrèdit required its customers to obtain credit insurance through a company called COFACE, an affiliate and 36% owner of Cofacrèdit.

Windsor is a Brooklyn-based plumbing supplier. Windsor World, now liquidated, was a Brooklyn-based retailer of plumbing supplies and maintained a showroom in Manhattan. Until Windsor World filed for bankruptcy protection in 1990, it was primarily supplied by Windsor. HED–US is a New York corporation formed to supply Windsor with plumbing fixtures manufactured by HED–France. HED–France was, until French liquidation proceedings, a French manufacturer of deluxe plumbing fixtures.

Sholam Weiss was the sole or majority owner of Windsor, Windsor World, and HED–US. Moshe Weiss, Sholam Weiss's brother, was President and 20% owner of Windsor World and an officer of Windsor. Lipszyc was Vice President of Windsor and showroom manager for Windsor World. Brandli was an executive of HED–France.

### B. *Facts*

#### 1. *Summary of the Scheme to Defraud*

In its Memorandum and Order, dated September 5, 1996, the district court found that the Defendants engaged in a scheme primarily designed to defraud Cofacrèdit and· Sociètè Gènèrale, a large French bank. In short, the Defendants submitted sham invoices to Cofacrèdit for factoring and assigned sham invoices to Sociètè Gènèrale in exchange for similar financing. The invoices appeared to evidence firm sales of plumbing fixtures by HED–France to Windsor and thus to require payment of a certain sum. But HED–France was not selling plumbing fixtures to Windsor. Instead, unbeknownst to Cofacrèdit and Sociètè Gènèrale, HED–France was consigning the plumbing fixtures to HED–US, which was, in turn, supplying the fixtures to Windsor and Windsor World. Under the consignment agreement, HED–US was not obligated to pay HED–France for the fixtures until they were sold to retail customers by Windsor World. Thus, while the invoices factored by Cofacrèdit and assigned to Sociètè Gènèrale appeared to evidence firm sales to Windsor, in fact they did not. The Defendants misrepresented the invoices as true sales for approximately 11 months. During this time, HED–France obtained payment from Cofacrèdit and Sociètè Gènèrale for goods it had not actually sold. For their part, the Windsor Defendants obtained cost-free in-

ventory. In addition, the Windsor Defendants represented the consigned inventory as owned inventory and used it as collateral for loans from other financial institutions. Through these actions, the district court found, the Defendants conspired to commit and did commit common-law fraud and civil RICO violations.

### 2. *The District Court's Findings of Fact*

In support of its verdict, the district court made the following findings of fact, each of which finds ample support in the record. In late 1987, Shalom Weiss and HED–France began negotiations to enter into a consignment agreement, pursuant to which HED–France would export products on a consignment basis to HED–US, a company Weiss agreed to form. HED–US would supply these items to Windsor, which would, in turn, supply Windsor World for retail sale. Under the terms of the intended agreement, HED–US would not pay HED–France for the consigned items until Windsor World sold them to retail customers.

In preparation for shipping goods to HED–US, HED–France purchased credit insurance from COFACE. Pursuant to the terms of the credit insurance policy, COFACE approved Windsor as a buyer of the exported items and agreed to guarantee HED–France payment on outstanding invoices of up to $1.5 million in face value. Because HED–US had not yet been formed, COFACE did not approve it as a buyer. Thus, in order to obtain the insurance, Brandli informed COFACE that the plumbing fixtures were being purchased by Windsor. Although the formal consignment agreement had not yet been inked and HED–US had not yet been formed, HED–France began exporting plumbing fixtures to Windsor on January 1988 pursuant to an informal consignment arrangement. HED–France invoiced these exports as if they were firm sales.

HED–France wanted to obtain immediate payment for the goods it shipped, but, under the consignment arrangement, could not collect from Windsor until the goods were resold. So, in exchange for cash, it assigned its right to receive payment on $421,985 of Windsor invoices to Sociètè Gènèrale. In February 1988, Sociètè Gènèrale began to seek payment on the first $131,023 of Windsor invoices that HED–France had assigned to it.

On March 1, 1988, Brandli wrote Lipszyc and Moshe Weiss complaining that HED–France was receiving pressure from Sociètè Gènèrale. Despite the informal consignment arrangement, on March 8, 1988, the Windsor Defendants agreed to pay the first Sociètè Gènèrale invoice in order to "have [the bank's] confidence." Sholam Weiss sent a fax to Sociètè Gènèrale stating:

> We as customers of [HED–France] entered into an agreement to sell their products in the United States and Canada. [HED–France] shipped us some merchandise although the agreement had not yet been finalized and signed. Since Mr. Brandli is coming to New York this Sunday, March 13, 1988, we will sign the agreement and therefore on Monday we will be able to wire funds to his account.

Windsor subsequently paid HED–France on this invoice. As a result, from March 16 through March 26, 1988, Sociètè Gènèrale financed four more HED–France/Windsor invoices.

Meanwhile, HED–France began to seek alternative financing for future invoices, eventually entering into a factoring agreement (the "Factoring Agreement") with Cofacrèdit on February 17, 1988. Pursuant to the terms of the Factoring Agreement, all factored invoices were required to represent "firm sales having already been delivered" and be subject to a "180 day maximum payment term." Further, all factored invoices had to be covered by credit insurance issued by COFACE, which, as noted above, had already issued insurance guaranteeing payments owed by

Windsor on HED–France invoices. Cofacrèdit and HED–France subsequently agreed upon a procedure for factoring invoices pursuant to the Factoring Agreement. The procedure required HED–France to affix a sticker to the invoice notifying the buyer that the right to receive payment on the invoice had been assigned to Cofacrèdit, and that payment was due to Cofacrèdit. These stickers also informed the buyer that "[a]ny objection to this bill or its terms must be reported to Cofacrèdit."

Eight days after the Factoring Agreement was executed, Brandli sent a fax to Lipszyc and Moshe Weiss stating that, for credit insurance purposes, all future shipments from HED–France must appear to be final sales to Windsor. And in his March 1, 1988 fax to Lipszyc and Moshe Weiss, Brandli explained in more detail how their dealings would have to work in the future:

> In the future, we must proceed otherwise. [W]e are to establish to you invoices payable at 120 days for example. The banks imperatively want a firm payment term. . . . It is mostly important to have the confidence from the bank.

At approximately the same time, HED–France and Windsor completed their plans to set up HED–US. HED–US and HED–France then signed a consignment agreement on March 15, 1988 (the "Consignment Agreement"), formalizing the informal consignment arrangement that had governed their transactions to date. With regard to the purchase of products by HED–US, the Consignment Agreement provided that:

> The purchase price shall be paid upon a "net 30, 25 end of month" basis following the sale of Products by [HED–US], it being understood that there is no obligation on the part of [HED–US] to make any payment until after the sale of the Products by [HED–US] has been consummated.

Consignment Agreement § 3(c). Section 5 of the Consignment Agreement provided

that HED–US would agree to "purchase" certain minimum quantities of HED–France's products pursuant to the terms of the Consignment Agreement. HED–US subsequently entered into a "non-arms length supply agreement" with Windsor World whereby Windsor World would not buy any products from HED–US (which was obligated to buy HED–France products only when sold to Windsor) until it had sold such to a customer. Windsor World thus always had HED–France inventory available to it without cost.

On April 8, 1988, Cofacrèdit began to factor HED–France invoices to Windsor as completed sales to Windsor. At trial, Sholam Weiss and a Windsor purchasing agent testified that none of the shipments from HED–France had been accompanied by invoices and that they had never seen the factoring stickers. The district court discounted this testimony and found that Windsor had received stickered invoices.

On April 15, 1988, Cofacrèdit mailed Windsor a written notice regarding the first three invoices it had factored. This notice stated: "The invoices on the enclosed list are covered by a factoring contract between your supplier and ourselves and represent a debt which has been legally transferred to us." Lipszyc received this notice and discussed it with Sholam Weiss. Lipszyc then faxed it to Brandli with a note saying "please advise what it means." At trial, Shalom Weiss testified that he did not know what the document was and that he had never heard of Cofacrèdit. The district court again refused to credit this.

In July 1988, a representative of Cofacrèdit, Beatrice Courtemanche, contacted Windsor to discuss payment of the first factored invoices, which were about to come due (at this time, Cofacrèdit had factored approximately $738,000 in Windsor/HED–France invoices). Courtemanche also faxed Windsor another notice of the factoring agreement and a list of the factored invoices. Soon thereafter, Sociètè

Gènèrale contacted Cofacrèdit and informed them that the invoices Sociètè Gènèrale had financed had not yet been paid. The Sociètè Gènèrale invoices were covered by the same COFACE insurance policy as those factored by Cofacrèdit, and COFACE refused to insure additional Windsor invoices while those assigned to Sociètè Gènèrale were overdue.[1] Therefore, Cofacrèdit would not factor any more Windsor invoices until the Sociètè Gènèrale invoices were paid. Accordingly, Cofacrèdit arranged to meet with Windsor, Brandli, COFACE, and Cofacrèdit on July 26, 1988 in Paris.

Lipszyc attended the meeting on behalf of both Windsor and Windsor World. COFACE explained to Lipszyc that it would not insure any more Windsor invoices, and Cofacrèdit explained that it could not factor any invoices that were not guaranteed by COFACE. Lipszyc explained that the Sociètè Gènèrale invoices were overdue because there had been problems with the quality of the HED–France products. Brandli then asked that the due dates be extended and offered to have letters of credit established to deal with subsequent invoices. Lipszyc agreed to this plan, but stated that he needed to get final approval from New York.

Cofacrèdit followed up with Lipszyc via fax on July 29, 1988, confirming that Windsor would soon pay the Sociètè Gènèrale invoices and giving specific extensions of the due dates. Lipszyc faxed Cofacrèdit back on August 3, explaining that the oldest invoice would be paid the next week and stating that "Moses Weiss, President of Windsor" wished to meet with Cofacrèdit, as he was already in Paris. Moshe Weiss met with Cofacrèdit the very next day. At this meeting Cofacrèdit explained that Windsor's final agreement to the newly negotiated payment terms was necessary for Cofacrèdit to continue financing

the HED–France invoices. Weiss did not inform Cofacrèdit of the Consignment Agreement.

On August 12, Lipszyc again faxed Cofacrèdit, this time informing it that he would go over the details of the factored invoices with Moshe Weiss, that the Sociètè Gènèrale invoices would be paid, and that they would arrange letters of credit to cover the outstanding invoices. On August 17, Cofacrèdit faxed Lipszyc back stating that payment via letter of credit would be acceptable. Windsor subsequently paid the first outstanding Sociètè Gènèrale invoice.

Encouraged by this resolution and payment, COFACE insured, and Cofacrèdit factored, more Windsor invoices. Cofacrèdit eventually factored 61 such invoices and only stopped doing so when, in September 1988, the unpaid invoices reached the limits of the $1.5 million COFACE insurance policy.

In early November 1988, Cofacrèdit representatives met with Windsor in New York in order to attempt to secure payment on the outstanding invoices. Later that month, Windsor revealed for the first time that it had no obligation to pay the invoices, as they represented consignment sales made to HED–US pursuant to the Consignment Agreement. In light of this disclosure, Cofacrèdit refused to factor any additional invoices. As a result, the Defendants' scheme to defraud Cofacrèdit and Sociètè Gènèrale came to an end.

While HED–France was submitting sham invoices for factoring, the Windsor Defendants used the consigned inventory to secure other financing from various lenders. In April 1988, the Windsor Defendants approached financial institutions seeking financing for HED–US and for two other affiliated companies, Designer Tile & Marble ("Designer Tile") and Serki Limited ("Serki"). One of the institutions, Bank Leumi, agreed to issue a $1.3 million

---

1. It is unclear whether COFACE refused to insure additional invoices simply because Windsor was not current on its payments or because, absent payment on the overdue invoices, additional invoices would cause the total amount of outstanding insured invoices to exceed the $1.5 million limits of the COFACE policy.

line of credit in favor of Designer Tile. This line of credit was guaranteed by Sholam Weiss personally and by each of his companies. It was secured by all of the assets, including the inventory, of those companies. Although it only held the HED–France inventory on consignment, HED–US included the inventory among the assets it claimed to own, thereby making its collateral appear more substantial that it actually was.[2] The inventory also benefitted Windsor and Windsor World by making it appear that their preexisting $3.5 million loan from CIT Group Business Credit, Inc. ("CIT") was better secured than it was.

As late as March 1990, Windsor continued to represent to Bank Leumi that HED–US inventory held pursuant to the Consignment Agreement served to secure Leumi's line of credit to Designer Tile. Then, in late 1990, Sholam Weiss called Bank Leumi and informed it that some of the inventory securing the loan had been stolen from a warehouse. Bank Leumi tried to cover this loss through an insurance policy, but was unsuccessful because Sholam Weiss failed to produce evidence that he owned the inventory allegedly stolen.

### 3. *The Proceedings Below*

Cofacrèdit sued Defendants in November 1988, alleging that they conspired to commit and did commit common-law fraud and civil RICO violations. Relying on the facts outlined above, the district court found for Cofacrèdit on each cause of action.[3] The court entered a judgment in favor of Cofacrèdit for $5,123,196.66, representing treble damages under RICO and pre-judgment interest. The court also awarded attorney's fees and costs. The Windsor Defendants timely appealed.

## II. ANALYSIS

On appeal, the Windsor Defendants argue that the district court misapplied the law to the facts in finding them liable for common-law fraud and substantive and conspiracy RICO violations. Along the way, they also challenge a number of the district court's factual findings as unsupported by the evidence. Finally, the Windsor Defendants contend that the district court abused its discretion in awarding Cofacrèdit prejudgment interest on the treble damage award.

### A. *Standard of Review*

■■■ We review the district court's conclusions of law and its application of the law to the facts *de novo. See United States v. McCombs,* 30 F.3d 310, 316–17 (2d Cir.1994). We review the district court's findings of fact only for clear error. Fed.R.Civ.P. 52(a); *see also Anderson v. City of Bessemer City,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985). A finding is clearly erroneous if "although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotations omitted). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Id.* at 574, 105 S.Ct. 1504. Finally, we review the district court's award of prejudgment interest only for abuse of discretion. *See Abou–Khadra v. Mahshie,* 4 F.3d 1071, 1084 (2d Cir. 1993).

### B. *Common–Law Fraud*

■■■ The district court found that the Windsor Defendants fraudulently misrepresented to Cofacrèdit the true nature of

---

**2.** At trial, the Windsor Defendants offered a letter from their lawyer to Bank Leumi, dated July 22, 1988, stating that HED–US's inventory was held on consignment. However, Jonathon Brand, a Bank Leumi loan officer, testified that he had never been so informed. The district court apparently credited Brand's testimony.

**3.** Because neither HED–France nor Brandli answered Cofacrèdit's charges, the court entered a default judgment against them.

their transactions with HED–France. In order to prevail on a fraudulent misrepresentation claim under New York law,[4] a plaintiff must show that: (1) the defendant made a false representation of a material fact; (2) with knowledge of its falsity; (3) with scienter, namely an intent to defraud the plaintiff; (4) and upon which plaintiff justifiably relied; (5) thereby causing damage to the plaintiff. *See Cohen v. Koenig,* 25 F.3d 1168, 1172 (2d Cir.1994); *Kregos v. Associated Press,* 3 F.3d 656, 665 (2d Cir. 1993). Each element must be proven by clear and convincing evidence. *See Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966, 971 (2d Cir.1987).

1. *The Terms of The Consignment Agreement*

■ The Windsor Defendants first argue that sales made pursuant to the Consignment Agreement were, in fact, true sales. Specifically, the Windsor Defendants contend that under the terms of the Consignment Agreement they were obligated to pay HED–France for a specified amount of product regardless of whether the product was resold to the Windsor Defendants' customers. As a result, the argument continues, the Defendants made no material misrepresentations when they led Cofacrèdit to believe that the invoices represented sales with firm payment terms. The Windsor Defendants contend that the district court's finding to the contrary is unsupported by the evidence.

The Windsor Defendants' argument is based solely on Section 5(a) of the Consignment Agreement, which provides:

> During the term of this Agreement,[HED–US] shall: Purchase from [HED–France] that quantity of Products as·follows: 1988—$400,000, 1989—$1,000,000, 1990—$1,500,000, 1991—$1,800,000, 1992—$2,000,000. In any event this will be cumulative so that the total amount at the end of 1992 is equal

to the. sum of $6,700,000 regardless of the yearly individual sums.

Read alone, this section appears to obligate HED–US to purchase, and presumably to pay for, $6.7 million of HED–France merchandise. However, as correctly noted in the district court's findings of fact, Section 3 of the same Consignment Agreement makes clear that the "purchases" outlined in Section 5(a) are not true sales, but consignments: Section 3 governs payment for "any Products purchased by [HED–US] hereunder," and goes on to explicitly state that "there is no obligation on the part of [HED–US] to make any payment until after the sale of the products by [HED–US] has been consummated." Thus, the "purchases" made mandatory by Section 5 were not purchases at all, but were, instead, consignments. This conclusion is reinforced, and the Windsor Defendants' argument foreclosed, by the fact that Windsor ultimately refused to pay Cofacrèdit, citing the contingent nature of the "sales" evidenced by the invoices. Any representation that the invoices evidenced firm sales was, therefore, a misrepresentation.

2. *The Windsor Defendants' Misrepresentation*

Next, the Windsor Defendants contend that, as mere customers of HED–France, they never engaged in actionable misrepresentation towards Cofacrèdit. They argue that the district court committed reversible error in finding otherwise. We disagree.

a. *Conspiracy to Defraud*

■ In finding the Windsor Defendants liable for fraud, the district court concluded that they were engaged with Brandli and HED–France in a conspiracy to defraud Cofacrèdit. As a result, the court imputed to the Windsor Defendants the misrepresentations made by Brandli and HED–France in furtherance of that con-

---

**4.** The parties agree that New York law governs this action, and we therefore apply it.

*See Hannex Corp. v. GMI, Inc.,* 140 F.3d 194, 203 n. 7 (2d Cir.1998).

**240**

spiracy. The Windsor Defendants now argue that there was insufficient evidence of a conspiracy.

■ To prove a conspiracy, a plaintiff must show a corrupt agreement, an overt act in furtherance of that agreement, and membership in the conspiracy by each defendant. *See Kashi v. Gratsos,* 790 F.2d 1050, 1055 (2d Cir.1986). As is true in criminal conspiracies, agreements in civil conspiracies will not easily be shown by direct evidence, but may be inferred from circumstantial evidence. In this case, there is ample evidence to support the conclusion that there was a conspiracy.

First, and most importantly, there is Brandli's March 1, 1988 fax to Lipszyc and Moshe Weiss. In this fax, Brandli suggests the need to make it appear as if the invoices have a firm payment date, when they in fact did not. When combined with the fact that each of the Windsor Defendants accepted product represented by stickered invoices, and later discussed the invoices with Cofacrèdit and Sociètè Gènèrale as if they were actual sales, the reasonable inference is that there was an agreement to misrepresent the consignment transactions as true sales.

There is also evidence to support a finding that each defendant joined the conspiracy and committed an overt act in furtherance thereof. Sholam Weiss—the self-described "president," "director," and "boss" of Windsor Plumbing Supply, the chairman and sole owner of Windsor World, and an owner of HED–US—sent the March 8 fax to Sociètè Gènèrale indicating that Windsor would pay the first Sociètè Gènèrale-financed invoice. Moshe Weiss, an employee of Windsor Plumbing and president of Windsor World, participated in the August meeting in Paris at which the amended payment plan was discussed. Lipszyc, a vice president of Windsor World, participated in the July 26, 1988 meeting in Paris at which the amended payment plan was initially discussed, and sent the August 12, 1988 fax agreeing to the amended payment plan.

Each of these acts furthered the scheme to defraud by representing to Sociètè Gènèrale and Cofacrèdit that the invoices represented true sales. Accordingly, the district court did not commit reversible error in finding that the Windsor Defendants conspired to defraud Cofacrèdit.

Because the district court's finding of a conspiracy was not in error, the court properly imputed to the Windsor Defendants all of the misrepresentations Brandli and HED–France made within the scope of the conspiracy. *See Kashi,* 790 F.2d at 1054–55 (stating that under New York law, proof of a civil conspiracy connects a defendant with the transaction, charges him with the acts of and declarations of his co-conspirators, and exposes that defendant to joint and several liability). The acts imputed to the Windsor Defendants include HED–France's tendering of invoices to Cofacrèdit for factoring. Given the terms of the Factoring Agreement, which required that all factored invoices represent "firm sales having already been delivered" subject to a maximum 180 day payment term, this tendering of invoices amounted to a representation by HED–France that the invoices evidenced firm sales to Windsor, when in fact they evidenced consignment shipments to HED–US. The district court properly charged the Windsor Defendants with their co-conspirators' misrepresentations.

b. *The Windsor Defendants' Misrepresentations*

■ The evidence that demonstrates the Windsor Defendants' membership in the conspiracy also shows that the Windsor Defendants themselves misrepresented material facts concerning their transactions with HED–France. As demonstrated above, each of the Windsor Defendants represented to Cofacrèdit that Windsor owed a sum certain to HED–France, and therefore to Sociètè Gènèrale and Cofacrèdit. Of course, this was not the case. Therefore, the district court did not err in finding that the Windsor Defendants

themselves made material misrepresentations. And because we conclude that the district court's finding of misrepresentation was not in error, we need not reach the Windsor Defendant's contention that the district court also erred in finding that they concealed the terms of the Factoring Agreement in the face of a duty to disclose.

### 3. *Scienter*

■■■■ The Windsor Defendants next contend that the district court erred in finding that they acted with the requisite intent. In fraud cases, scienter may be proven by circumstantial evidence. *See Mayer v. Oil Field Sys. Corp.*, 803 F.2d 749, 756 (2d Cir.1986). A common method of proving scienter is to establish facts showing a motive for committing fraud and a clear opportunity for doing so. *See, e.g., Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir.1985). As noted above, the district court found, and the evidence supports the conclusion, that the Windsor Defendants had compelling motives for engaging in the fraudulent scheme: They benefitted both by receiving cost-free inventory and by using that inventory to secure new financing. Moreover, the record supports the court's conclusion that the Windsor Defendants did in fact use the consigned inventory to secure such financing, specifically the line of credit from Bank Leumi. As a result, the district court's finding of scienter was not in error.

### 4. *Justifiable Reliance*

■■■■ The Windsor Defendants next argue that Cofacrèdit did not justifiably rely on any of their misrepresentations. "Where sophisticated businessmen engaged in major transactions enjoy access to critical information but fail to take advantage of that access, [courts applying New York law] are disinclined to entertain claims of justifiable reliance." *Grumman Allied Indus. v. Rohr Indus., Inc.*, 748 F.2d 729, 737 (2d Cir.1984). The Windsor Defendants' contention that Cofacrèdit was not justified in relying on the invoices centers on the claim that Cofacrèdit failed to take advantage of access to the true terms of the relationship between the Windsor Defendants and HED–France. We reject this argument for a number of reasons.

First, there is no evidence that Cofacrèdit had access to the Consignment Agreement that defined the true terms of the HED–US/HED–France transactions. To the contrary, the evidence strongly supports the conclusion that the defendants concealed the existence of the Consignment Agreement until the COFACE limits were met and the scheme came to its natural conclusion. Second, in contrast to the cases cited by the Windsor Defendants, *see Slavenburg Corp. v. Baby Doll Infants' Wear*, Index No. 00360/90 (N.Y. Sup.Ct. June 24, 1996), a routine financial investigation would not have revealed the true nature of the misrepresentations, which was not dependent on the Defendants' financial health. Third, Cofacrèdit did take reasonable precautions to protect itself from fraud. It advanced funds to HED–France only upon receiving Windsor invoices evidencing a firm payment date. *See Sunkyong Am., Inc. v. Beta Sound of Music Corp.*, 199 A.D.2d 100, 101, 605 N.Y.S.2d 62 (1993) (invoice is the parties' final written expression of the sales agreement). It then followed its usual procedures by having all factored invoices stickered to reflect the factoring, notifying Windsor of the existence of the Factoring Agreement, and contacting the Windsor Defendants once they began to fall behind in payment. Accordingly, Cofacrèdit's reliance on the misrepresentations was justifiable, and the judgment of the district court is affirmed as to Cofacrèdit's common-law fraud claim.

### C. *The RICO Counts*

The Windsor Defendants next argue that there was insufficient evidence to support the district court's conclusion that they committed a substantive civil RICO violation, 18 U.S.C. § 1962(c), and con-

spired to commit such a violation. 18 U.S.C. § 1962(d). We analyze these claims in turn.

### 1. *The Substantive RICO Count*

■ Section 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). To establish a claim for a civil violation of section 1962(c), "a plaintiff must show that he was injured by defendants' (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Azrielli v. Cohen Law Offices,* 21 F.3d 512, 520 (2d Cir.1994) (internal quotations omitted).

RICO defines "racketeering activity" to include a host of criminal offenses, which are in turn defined by federal and state law. *See* 18 U.S.C. § 1961(1). Here, however, the racketeering activity with which Cofacrèdit charges the Windsor Defendants includes only mail fraud, in violation of 18 U.S.C. § 1341, and wire fraud, in violation of 18 U.S.C. § 1343. Mere common-law fraud does not constitute racketeering activity for RICO purposes. *See* 18 U.S.C. § 1961(1).

■ RICO defines "pattern of racketeering activity" as requiring "at least two acts of racketeering activity" committed in a 10 year period. 18 U.S.C. § 1961(5); *see also Azrielli,* 21 F.3d at 520. To establish a pattern, a plaintiff must also make a showing that the predicate acts of racketeering activity by a defendant are "related, *and* that they amount to or pose a threat of continued criminal activity." *See H.J., Inc. v. Northwestern Bell Tel. Co.,* 492 U.S. 229, 239, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989).

■ The continuity necessary to prove a pattern can be either "closed-ended continuity," or "open-ended continuity."

*See id.* at 239, 241, 109 S.Ct. 2893. Closed-ended continuity is demonstrated by predicate acts that "amount to continued criminal activity," by a particular defendant. To satisfy closed-ended continuity, the plaintiff must prove "a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months ... do not satisfy this requirement." *Id.* at 242, 109 S.Ct. 2893. Since the Supreme Court decided *H.J., Inc.,* this Court has never held a period of less than two years to constitute a "substantial period of time." *See GICC Capital Corp. v. Technology Finance Group, Inc.,* 67 F.3d 463, 467 (2d Cir.1995); *see also Metromedia Co. v. Fugazy,* 983 F.2d 350, 369 (2d Cir.1992) (finding closed-ended continuity when predicate acts occurred over a period of two years); *Jacobson v. Cooper,* 882 F.2d 717, 720 (2d Cir.1989) (finding closed-ended continuity when predicate acts occurred over a "matter of years"). Other circuits have similarly held. *See GICC Capital Corp.,* 67 F.3d at 468 (collecting cases). Although closed-ended continuity is primarily a temporal concept, other factors such as the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists. *Id.*

■ To satisfy open-ended continuity, the plaintiff need not show that the predicates extended over a substantial period of time but must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed. *Id.* at 242–43, 97 S.Ct. 441. In assessing whether or not the plaintiff has shown open-ended continuity, the nature of the RICO enterprise and of the predicate acts are relevant. *See Schlaifer Nance & Co. v. Estate of Andy Warhol,* 119 F.3d 91, 97 (2d Cir.1997); *GICC Capital Corp.,* 67 F.3d at 466. Where the enterprise is engaged primarily in racketeering activity, and the predicate acts are inherently unlawful, there is a

threat of continued criminal activity, and thus open-ended continuity. *See H.J. Inc.,* 492 U.S. at 242–43, 109 S.Ct. 2893 ("[T]he threat of continuity is sufficiently established where the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes."). However, where the enterprise primarily conducts a legitimate business, there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity. *See id.* at 243, 109 S.Ct. 2893; *GICC Capital Corp.,* 67 F.3d at 466; *Azrielli,* 21 F.3d at 521.

The district court found that Cofacrèdit proved both closed and open-ended continuity. In finding closed-ended continuity, the district court determined that the Defendants committed their first related predicate act in early 1988, when they used interstate wires and mails to begin financing sham invoices through Sociètè Gènèrale. The court found that the predicate acts continued through late 1990, when Sholam Weiss telephoned Bank Leumi to falsely report a burglary of the HED–US inventory. Also included in the pattern found by the district court was Shalom Weiss's March 1990 representation to Bank Leumi that Leumi's loans were secured by $1.5 million in merchandise actually owned by HED–France. Thus, the district court found that the predicates spanned well over two years and displayed closed-ended continuity under our decisions.

As noted above, the duration of a pattern of racketeering activity is measured by the RICO predicate acts the defendants commit. *See H.J., Inc.,* 492 U.S. at 242, 109 S.Ct. 2893 (continuity test looks to period during which predicate acts were committed); *GICC Capital Corp.,* 67 F.3d at 467 (actions that do not constitute predicate racketeering activity not included in continuity calculation). Here, the district

court found that the Windsor Defendants committed multiple predicate acts of mail and wire fraud over a nearly three-year period. The mail fraud statute requires that a defendant use the mails in furtherance of scheme to defraud. 18 U.S.C. § 1341. The wire fraud statute requires that the defendant communicate by wire in "interstate or foreign commerce" in furtherance of a scheme to defraud. 18 U.S.C. § 1343. "[P]urely intrastate communication [is] beyond the statute's reach." *Smith v. Ayres,* 845 F.2d 1360, 1366 (5th Cir.1988); *see also United States v. DeBiasi,* 712 F.2d 785, 791–92 (2d Cir. 1983); *United States v. Muni,* 668 F.2d 87, 89–90 (2d Cir.1981); *Utz v. Correa,* 631 F.Supp. 592, 596 (S.D.N.Y.1986) (a RICO predicate act of wire fraud "requires an interstate telephone call").

The district court did not err in finding that the Defendants committed predicate acts of mail and wire fraud when they communicated with Sociètè Gènèrale, Cofacrèdit, and with each other, in furtherance of the scheme to factor sham invoices: During the period beginning in early 1988 and ending in November 1988, the Windsor Defendants utilized the mails, made international phone calls, and sent international faxes in furtherance of their scheme to defraud Cofacrèdit and Sociètè Gènèrale.

However, the district court did err in considering Sholam Weiss's 1990 phone calls to Bank Leumi as predicate acts of wire fraud that extended the pattern of racketeering activity for an additional two years. The evidence Cofacrèdit presented at trial did not demonstrate that Weiss's phone calls to Bank Leumi were interstate or international in nature. To the contrary, Weiss lived and worked in Brooklyn, and the Bank Leumi offices with which he communicated were located on Manhattan and Long Island. Thus, the record evidence does not support the conclusion that the phone calls between Weiss and Bank Leumi constitute predicate acts of wire fraud. Indeed, Cofacrèdit has not

identified, and we have been unable to find, any evidence of mail or wire fraud committed against Bank Leumi after the scheme to defraud Cofacrèdit came to an end in November 1988. As a result, even assuming that the acts of mail and wire fraud committed upon Sociètè Gènèrale and Cofacrèdit were sufficiently related to form a single pattern of racketeering activity,[5] the predicate acts that the Windsor Defendants committed spanned less than one year-a period of insufficient length to demonstrate closed-ended continuity under our precedents. *See GICC Capital Corp.,* 67 F.3d at 467–69 (predicates occurring over eleven-month period insufficient).

■ The district court also found that Cofacrèdit demonstrated open-ended continuity by showing that the acts of mail and wire fraud typified the Windsor Defendants' regular way of conducting their business. Again, the court appears to have improperly taken into account Weiss's phone calls to Bank Leumi in reaching this conclusion. Taking into account only the predicate racketeering activity that Cofacrèdit did prove, we conclude that the evidence is insufficient to support the court's finding. While the Windsor Defendants did commit mail and wire fraud against Sociètè Gènèrale and Cofacrèdit for nearly one year from early 1988 to November 1988, there is insufficient evidence to support a finding that these crimes were a regular means by which the Windsor Defendants conducted their plumbing supply business. Instead, the evidence showed that the Windsor Defendants engaged in a serious, but discrete and relatively short-lived scheme to defraud a handful of victims through racketeering activity. *See GICC Capital Corp.,* 67 F.3d at 468–69. Moreover, the nature of the predicate acts themselves does not imply a threat of ongoing racketeering activity. To the contrary, because the CO-FACE limits had been met, the Windsor

Defendants' scheme to obtain cost-free inventory had necessarily come to its conclusion: We have previously held that such an "inherently terminable" scheme does not imply a threat of continued racketeering activity. *See id.* at 466.

Because we find insufficient evidence of closed and open-ended continuity, we reverse that portion of the district court's judgment finding the Windsor Defendants liable to Cofacrèdit under 18 U.S.C. § 1962(c). We do not reach the Windsor Defendants' arguments that Cofacrèdit failed to prove the existence of an enterprise and failed to demonstrate that the RICO predicate acts were sufficiently related to form a pattern.

### 2. *The RICO Conspiracy Count*

■ The district court also found the Windsor Defendants liable for violating 18 U.S.C. § 1962(d), which makes it "unlawful for any person to conspire to violate any of the provisions of" 18 U.S.C. § 1962(a), (b), or (c). The Windsor Defendants again argue that there was insufficient evidence to support the district court's finding of liability. Again, we agree.

■ To establish the existence of a RICO conspiracy, a plaintiff must prove " 'the existence of an agreement to violate RICO's substantive provisions.' " *United States v. Sessa,* 125 F.3d 68, 71 (2d Cir. 1997) (*quoting United States v. Benevento,* 836 F.2d 60, 73 (2d Cir.1987)), *cert. denied sub nom., Scarpa v. United States,* —— U.S. ——, 118 S.Ct. 731, 139 L.Ed.2d 669 (1998). Thus, Cofacrèdit necessarily had to establish that the Windsor Defendants agreed to form and associate themselves with a RICO enterprise and that they agreed to commit two predicate acts in furtherance of a pattern of racketeering activity in connection with the enterprise. *Id.* Additionally, Cofacrèdit was required to prove that if the agreed-upon predicate acts had been carried out, they would have

---

**5.** As noted in the discussion that follows, because we find the requisite continuity lacking, we express no opinion on whether the predi-cate acts of racketeering that the Windsor Defendants did perform were sufficiently related to form a RICO pattern.

constituted a pattern of racketeering activity. *See Salinas v. United States*, 522 U.S. 52, 118 S.Ct. 469, 477, 139 L.Ed.2d 352 (1997) ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense. . . .").

As noted above, there is insufficient evidence that the Windsor Defendants actually committed predicate acts displaying the continuity necessary to support a substantive RICO violation. And there is no evidence that the Windsor Defendants agreed to perform additional predicate acts that, if committed, would have displayed continuity sufficient to establish a pattern of racketeering activity. To the contrary, the Windsor Defendants appear to have carried out all of the predicate acts they agreed to commit. There was, therefore, no agreement to engage in a pattern of racketeering activity. As a result, we reverse that portion of the district court's judgment finding the Windsor Defendants liable to Cofacredit under 18 U.S.C. § 1962(d). And because we find insufficient factual bases for holding the Windsor Defendants liable for substantive or conspiracy RICO violations, we reverse those portions of the judgment awarding Cofacredit treble damages, costs, and attorney's fees pursuant to 18 U.S.C. 1964(c).

### D. *Prejudgment Interest*

Finally, the Windsor Defendants argue that the district court abused its discretion in awarding Cofacredit prejudgment interest on the damage award. The Windsor Defendants' contention on this score is premised on the notion that prejudgment interest is unavailable when treble damages are awarded under RICO. Because we reverse the district court's findings of RICO liability and vacate the treble damage award, we need not consider the Windsor Defendants' argument. However, we remand the case to the district court for re-calculation of prejudgment interest based on damages awarded pursuant to Cofacredit's successful common-law claim.

### III. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed in part, and reversed in part. The case is remanded to the district court for re-calculation of prejudgment interest based on the damages awarded pursuant to Cofacredit's common-law claim. No costs.