**WEDBUSH MORGAN SECURITIES, INC., Petitioner,**

v.

**ROBERT W. BAIRD & CO., Respondent.**

**No. 03 Civ.7195(JGK).**

United States District Court, S.D. New York.

May 31, 2004.

Matthew J. Borger, Michael K. Coran, William J. Clements, Klehr, Harrison, Harvey, Branzburg & Ellers, L.L.P., Philadelphia, PA, for Petitioner.

Caryn G. Mazin, Piper, Rudnick, L.L.P., New York City, for Respondent.

## OPINION and ORDER

KOELTL, District Judge.

Wedbush Morgan Securities, Inc. ("Wedbush") has filed a petition to vacate an award entered by a New York Stock Exchange ("NYSE") Arbitration Panel in favor of the respondent Robert W. Baird & Co. ("Baird"). *See Robert W. Baird & Co. vs. Wedbush Morgan Sec., Inc.*, No.2001–

009432 (N.Y.SE July 14, 2003) (Decision) (attached as Ex. A to Petition to Vacate Arbitration Award ("Petition")). Baird opposes the petition and has cross-petitioned for confirmation of the award. The petition and cross-petition have been brought pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 9, 10.[1]

### I.

The following facts are undisputed unless otherwise noted. The dispute arises out of a chain of stock loan transactions involving shares of Genesis Intermedia, Inc. ("GENI"). On June 18, 2001, Baird loaned to Wedbush 885,000 shares of GENI stock, and Wedbush transferred to Baird $15,930,000 in cash collateral, which reflected a market value of $18 per share of GENI stock. (Petition ¶ 58.) Baird obtained the GENI shares by entering simultaneously into a separate transaction with MJK Clearing, Inc. ("MJK"), in which MJK loaned to Baird 885,000 GENI shares in exchange for $15,930,000 in cash collateral. (*Id.*)[2]

The parties to the MJK–to–Baird–to–Wedbush transactions (the "June 18 Loan") followed the practice of marking the collateral to the market based on a daily determination of the GENI stock price. (*Id.* ¶ 50.) Through the "marking to market" parameters, when the stock price would fall or rise, a corresponding amount of cash collateral would be returned to or provided by the borrower. Marking to the market ensures that the stock loan position remains collateralized at the agreed-upon rate.

In September 2001, the GENI stock price fell substantially, causing Baird's collateral from Wedbush to be marked down to $7,965,000. (*See id.* ¶¶ 64–67.) The collapse of the GENI stock price caused MJK to be put into receivership and prevented MJK from being able to return Baird's cash collateral on its portion of the June 18 Loan. (*Id.* ¶¶ 64–65.) On September 26, 2001, Wedbush attempted to remit the 885,000 GENI shares to Baird, but Baird refused to accept the shares and refused to return to Wedbush the remaining $7,965,000 in cash collateral. (*Id.* ¶ 67.)

On September 28, 2001, Baird filed a claim against Wedbush with the NYSE Department of Arbitration, seeking declaratory and injunctive relief that it was not required to return the $7,965,000 to Wedbush. (*Id.* ¶ 70.) Wedbush counterclaimed for the return of its collateral, arguing that Baird breached the ("MSLA") Master Securities Loan Agreement between Baird and Wedbush that allegedly applied to the June 18 Loan. (*Id.* ¶ 71.)

The basis for Baird's claim and its primary defense was that Wedbush allegedly knowingly and recklessly participated in a fraudulent scheme involving GENI stock masterminded by convicted felon Kenneth D'Angelo. Baird argued that the June 18 Loan was one of the chain transactions D'Angelo structured to manipulate the market price of GENI shares. When the scheme collapsed, it forced MJK into receivership, and, as MJK's immediate downstream lender, Baird would have been forced to bear the loss of MJK's collapse. Baird thus asserted against Wedbush a fraud claim and affirmative

---

**1.** The basis for jurisdiction is 28 U.S.C. § 1332. Baird is a Wisconsin corporation with its principal place of business in Wisconsin, and Wedbush is a California corporation with its principal place of business in California. (Petition ¶¶ 15–18.)

**2.** Wedbush then used the 885,000 shares obtained from Baird to provide a loan to HSBC Canada ("HSBC") in exchange for $15,930,000 in collateral. (*Petition* ¶ 58.)

fraud-related defenses on the grounds that Wedbush participated in and concealed the GENI stock scheme and was not entitled to reclaim the $7,965,000.

Baird presented two other defenses to Wedbush's breach of contract claim. Baird argued that Wedbush could not recover because Baird was merely acting as the agent of MJK, and not a principal, in the June 18 Loan. Baird also argued that the MSLA did not apply to the June 18 Loan because there were no communications of any kind between Baird and Wedbush.

A highly distinguished panel of three arbitrators (the "Panel") was selected pursuant to NYSE Arbitration Rules. It included William J. Crowe, Frank W. Giordano, and Joseph L. Gitterman. The Panel held a twelve-day evidentiary hearing that included the testimony of numerous witnesses, over three hundred exhibits, and audio-taped telephone calls, followed by substantial post-hearing briefing. The evidence was mostly directed at the allegations that Wedbush facilitated and concealed the GENI scheme in relation to the June 18 Loan.

On July 14, 2003, the Panel issued a unanimous decision in favor of Baird that "it does not have to accept delivery of the Geni shares from respondent and does not have to pay respondent $7.965 million." (*See* Petition ¶ 11 (quoting Decision).) The Panel also granted "a permanent injunction prohibiting Wedbush from attempting to deliver the Geni shares to Baird," and it otherwise denied all other claims by Baird and Wedbush. (*Id.*) The Panel, however, did not explain the bases for its decision, and merely summarized Baird's position as "claiming, *inter alia* fraud." (*Id.*) This petition followed on September 15, 2003.

## II.

■ The task for a party seeking to vacate an arbitration award is a formidable one. The party challenging an arbitration award generally bears a heavy burden of proof, and limited review of arbitration decisions is necessary both to effectuate the parties' agreement to submit their disputes to arbitration and to avoid costly and protracted litigation about issues the arbitrators have already decided. *See, e.g., DiRussa v. Dean Witter Reynolds Inc.,* 121 F.3d 818, 821 (2d Cir.1997); *Willemijn Houdstermaatschappij, BV v. Standard Microsys. Corp.,* 103 F.3d 9, 12 (2d Cir. 1997); *In re Arbitration Between Space Sys./Loral, Inc. and Yuzhnoye Design Office,* 164 F.Supp.2d 397, 403 (S.D.N.Y. 2001).

Wedbush argues that the arbitration award should be vacated because the Panel manifestly disregarded the law in reaching its decision. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker,* 808 F.2d 930, 933 (2d Cir.1986) (explaining judicially created doctrine of manifest disregard of the law).[3] The Court of Appeals for the Second Circuit has repeatedly emphasized that review of an arbitration award for manifest disregard of the law is "severely limited," and "to modify or vacate an award on this ground, a court must find both that (1) the arbitrators knew of a

---

**3.** Wedbush also cites section 10 of the FAA, which provides that awards may be vacated "where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made." 9 U.S.C. § 10(a)(4). Wedbush has made it clear that it views the statutory and the common law standards as the same for this case and that its argument is based on the Panel's alleged disregard of the law and evidence. This Order thus applies the standards for the doctrine of manifest disregard of the law. The result would be no different under 9 U.S.C. § 10(a)(4).

governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." *Halligan v. Piper Jaffray, Inc.,* 148 F.3d 197, 202 (2d Cir.1998) (internal quotations omitted); *see also Duferco Int'l Steel Trading v. T. Klaveness Shipping A/S,* 333 F.3d 383, 389–91 (2d Cir.2003); *DiRussa,* 121 F.3d at 821.

■ Review under the doctrine of manifest disregard of the law is not an inquiry into the correctness of the decision, and the "erroneous application of rules of law is not a ground for vacating an arbitrator's award, nor is the fact that an arbitrator erroneously decided the facts." *Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 892–93 (2d Cir.1985) (citations omitted); *see Bobker,* 808 F.2d at 933–34 (explaining that court is "not at liberty to set aside an arbitration panel's award because of an arguable difference regarding the meaning or applicability of laws urged upon it"). Instead, the error must be "plainly evident from the arbitration record," *Duferco,* 333 F.3d at 388, such that it is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Bobker,* 808 F.2d at 933.

■ Arbitrators are not required to provide explanations for their decisions, and in this case, the Panel provided no explanation. *See Willemijn,* 103 F.3d at 12. When the bases for the decision are not explained, the reviewing court must attempt to infer from the facts of the case whether the arbitrators appreciated and ignored a clearly governing legal principle. *Id.* at 12–13. The arbitration decision

must be confirmed if there is any basis for upholding the decision and "[i]f there is even a barely colorable justification for the outcome reached." *Id.* at 13 (internal quotations omitted); *see also GMS Group v. Benderson,* 326 F.3d 75, 78 (2d Cir.2003) (stating that where there is no written opinion, court must confirm award if it can "discern any colorable justification for the arbitrator's judgment, even if that reasoning would be based on an error of fact or law" (internal quotations omitted)); *but see Halligan,* 148 F.3d at 204 (stating that where explanation, if given, "would have strained credulity," lack of written opinion may be considered in finding manifest disregard). Vacating an award for manifest disregard is appropriate only in "those exceedingly rare instances where some egregious impropriety on the part of the arbitrators is apparent." *Duferco,* 333 F.3d at 389.

### III.

Wedbush's argument that the Panel's decision was in manifest disregard of the law can almost be rejected on its face. Nowhere does Wedbush identify a principle of law that the Panel allegedly understood and ignored, or even misapplied. Wedbush does not dispute that its alleged fraud would be a sufficient basis for the arbitrators' decision and that the parties vigorously argued to the arbitrators whether the evidence in this case supported a finding that Wedbush participated in a fraud against Baird. Instead, Wedbush claims that the evidence, viewed in its totality, is insufficient to show that it participated in the GENI stock scheme and defrauded Baird with respect to the June 18 Loan.[4]

---

**4.** Some decisions in this Circuit have recognized a "manifest disregard for the evidence" inquiry based on *Halligan,* where overwhelming evidence contradicted a denial of a claim under the Age Discrimination in Employment Act. *See Halligan,* 148 F.3d at 203–04; *Campbell v. Cantor Fitzgerald & Co.,* 21 F.Supp.2d 341, 345 (S.D.N.Y.1998), *aff'd,* 205 F.3d 1321

■ The issues at the arbitration now raised in the Petition include Wedbush's participation in the GENI stock scheme, its intent and duties in entering into the June 18 Loan, and the materiality of certain non-disclosed information. All of the issues require a fact-intensive inquiry, based largely on the credibility of witnesses, including Wedbush's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"). Such determinations are beyond the severely limited scope of judicial review for manifest disregard. *See, e.g., Ganguly v. Charles Schwab & Co.,* No. 03 Civ. 6454, 2004 WL 213016, at *3–*4 (S.D.N.Y. Feb. 4, 2004) (refusing to vacate decision that, "[r]ather than turning on issues of law," turned on "fact-intensive issues," including "credibility issues, which are beyond this Court's power to review"). In its voluminous submission, Wedbush does not even attempt to argue that any error by the Panel is "obvious and capable of being readily and instantly perceived by the average person qualified to serve as an arbitrator." *Bobker,* 808 F.2d at 933. Moreover, the arbitration record reveals a substantial basis to conclude that a fraud-related claim or defense relieved Baird of any obligation to return Wedbush's posted collateral.

### A.

Ample evidence was presented as to Wedbush's participation in the GENI stock scheme orchestrated by Kenneth D'Angelo ("D'Angelo"), who had a criminal background and reputation for fraudulent activity in the securities markets. The scheme involved inflating the value of GENI stock by floating loans of the stock from a shell corporation to Canadian banks through a thinly capitalized securities broker-dealer, Native Nations Securities, Inc. ("Native Nations"). To increase the available capital and the number of shares that could be floated, other broker-dealers were inserted into the stock loan chains, including MJK, which borrowed massive quantities of GENI stock from Native Nations and then loaned the stock through other broker-lenders.

Wedbush's connection to the scheme began in April 2001, when Wedbush agreed with D'Angelo to borrow and then lend to two Canadian entities approximately 2.3 million GENI shares worth over $28 million. It is clear that Wedbush, and particularly John Giuca ("Giuca"), the Wedbush Stock Loan Department Manager, was in close contact with D'Angelo after that deal. Evidence, including audio-taped telephone calls, indicated that Giuca and other Wedbush employees grew suspicious of D'Angelo's tactics and transactions, but Wedbush nonetheless became heavily concentrated in GENI stock. Evidence was also presented that Wedbush began improperly suppressing or altering marks on the GENI loans and agreed to help D'Angelo pressure other brokers in the loan chains. (*See, e.g.,* R. 1742 (Tr. 172–74); R. 1744 (Tr. 185–86); R. 1806–08 (Tr. 448–56); R. 2561–74.)

In early June 2001, CEO Ed Wedbush and CFO Peter Allman–Ward ("Allman–Ward") began investigating the GENI loans. The Panel heard testimony and

---

(2d Cir.1999). *Halligan,* however, grew out of the "unique concerns at issue with employment discrimination claims" where mandatory arbitration clauses in employment contracts may limit employees' ability to enforce federal statutory rights. *See GMS Group,* 326 F.3d at 79; *see also Halligan,* 148 F.3d at 204; *Space Systems/Loral, Inc.,* 164

F.Supp.2d at 406. Such a concern is not present where two sophisticated corporations submit a dispute to an NYSE Arbitration Panel. At any rate, even in a manifest disregard of the evidence inquiry, challenging "the credibility of the evidence ... is not a proper basis upon which to vacate the award at issue." *Campbell,* 21 F.Supp.2d at 345.

saw evidence, including hand-written notes by Allman–Ward, suggesting that Wedbush became aware: that GENI stock was the subject of a market manipulation known as a "short squeeze"; that Wedbush was receiving suspiciously favorable rates on the GENI loans that did not match the rates on the "Street"; and that that the entire public float of GENI stock was approximately two million shares but that Wedbush was already loaning more than that amount. (*See* R.1923–29; R. 2766.) Nonetheless, Wedbush approved for D'Angelo an additional 885,000–share/ $15,950,000 loan of GENI stock-the June 18 Loan. That loan brought Wedbush's total position in GENI stock to 3.134 million shares with a value of $56,413,800–an amount that well exceeded Wedbush's internal policy regarding single security credit limits. (*See* R. 1740 (Tr. 161–62).)

MJK was to provide the stock for the June 18 Loan, but MJK had exhausted its credit with Wedbush. D'Angelo thus needed a "run through" or intermediary to be inserted into the chain of transactions between MJK and Wedbush. The Panel heard taped phone conversations where Giuca and a member of D'Angelo's firm discussed which brokers could be used as the intermediary, and in those conversations they chose Baird. (*See* R. 2654–66, 2668–69.) Baird was contacted by MJK and agreed to take part in the June 18 Loan, the details of which had been pre-arranged by Wedbush and MJK, and, unbeknownst to Baird, by D'Angelo.

Wedbush has claimed that it and Baird stood in the same position in the June 18 Loan and were equally victims of D'Angelo's scheme. The Panel was entitled to reject such assertions of ignorance and to find the Wedbush witnesses not credible. For example, prior to the hearing, Giuca signed declarations disclaiming any knowledge of MJK's involvement in the June 18

Loan at the time of the transaction. (*See* R. 2682, 2690.) But during the arbitration, he was forced to admit that when the transaction was being set up, he had in fact known about MJK's involvement. (R. 1847–49 (Tr. 596–606).) The testimony of Allman–Ward, meanwhile, revealed that Wedbush was involved in loaning over 3 million of the 7 million GENI shares on the "Street." (R.2009–10 (Tr. 1370, 1374–76).) Wedbush was thus connected to, in the words of Arbitrator Gitterman, "damn near half" of the shares used in D'Angelo's scheme. (*Id.* (Tr. 1371).) Attempts by Allman–Ward to downplay his knowledge of or involvement in D'Angelo's scheme repeatedly generated expressions of incredulity from Arbitrator Gitterman. (*See* R.1926 (Tr. 973–77); R.2008 (Tr. 1360–62); R.2010 (Tr. 1372).)

### B.

In connection with the above evidence, Baird raised fraud-related claims and defenses, including fraud/fraudulent inducement, aiding and abetting fraud, *in pari delicto*, illegality, and breach of the covenant of good faith and fair dealing. Primarily, Baird asserted a claim of fraudulent omission on the grounds that Wedbush, while in a position of superior knowledge, failed to disclose material facts indicating that the loan was part of an unstable and possibly illegal scheme being orchestrated by the notorious D'Angelo.

To establish fraud by omission under New York law, Baird was required to show by clear and convincing evidence (1) that Wedbush had a duty to disclose certain information, (2) that the withheld information was material (3) that Wedbush acted with scienter, (4) that Baird reasonably relied on Wedbush to disclose the facts omitted, and (5) that the omissions caused a loss to Baird. *See Banque Arabe*

**130**

*et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995); *Nomura Sec. Int'l v. E\*Trade Sec., Inc.,* 280 F.Supp.2d 184, 204–07 (S.D.N.Y.2003).[5] A duty to disclose can arise where (a) one party has "superior knowledge" of certain information; (b) that information is not known or readily available to the other party; and (c) the first party knows that the second party is acting on the basis of mistaken knowledge. *See Banque Arabe,* 57 F.3d at 155; *Brass v. Am. Film Tech., Inc.,* 987 F.2d 142, 150 (2d Cir.1993); *Nomura,* 280 F.Supp.2d at 205.

█ There was ample evidence that Wedbush had superior knowledge about material facts that Wedbush had a duty to disclose. Wedbush indisputably had a close connection to D'Angelo, and the record supported the inference that Wedbush knew: that the stock loan was part of a "short squeeze" manipulation; that its position in GENI stock exceeded the number of shares being publicly floated; that D'Angelo and Wedbush had previously arranged to suppress marks on loans; and that the sources of the GENI stock lacked the capital to support the massive amounts of stock floated. *See Nomura,* 280 F.Supp.2d at 205 (finding on motion for summary judgment that evidence supported duty to disclose where broker allegedly knew its GENI holdings exceeded public float). After evaluating the witnesses and their credibility, the Panel could well have found that the information was not "readily available" and that Wedbush was in a position of superior knowledge that required it to disclose facts behind the June 18 Loan, including D'Angelo's role in the transaction. *See Brass,* 987 F.2d at 151 (explaining that

buyer need not conduct investigations to unearth information not manifest).

Such information easily could be found material. Wedbush's own expert testified that he would not have participated in any transaction involving D'Angelo and would terminate any loan that he discovered was part of a "short squeeze" market manipulation. (R. 2280–81 (Tr. 2435–37); R. 2283 (Tr. 2449–52).) Baird Vice President Dave Meyer also testified, for example, that he would have never joined in the June 18 Loan had D'Angelo's involvement been disclosed. (*See* R.2096–97 (Tr. 1647–48).)

The record also provides a reasonable justification for concluding that Wedbush knowingly participated in D'Angelo's scheme and withheld material information with the intent of inducing Baird to act as the "run-through" in the June 18 Loan. *See Brown v. Stinson,* 821 F.Supp. 910, 914 (S.D.N.Y.1993) ("To establish scienter plaintiff must show an intentional or reckless misstatement made with the intent that plaintiff rely upon it."); *Pappas v. Harrow Stores, Inc.,* 140 A.D.2d 501, 528 N.Y.S.2d 404, 407 (2d Dep't 1988). Given the evidence of Wedbush's knowledge of the material facts it failed to disclose, combined with its role in selecting Baird as the intermediary, the Panel could well have found a knowing and intentional failure to disclose material facts. Furthermore, scienter can be proved through circumstantial evidence establishing facts "showing a motive for committing fraud and a clear opportunity for doing so." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,* 187 F.3d 229, 241 (2d Cir.1999). Wedbush had a motive to assist D'Angelo, who brought substantial business to Wedbush, in arranging the June 18 Loan. In-

---

**5.** The parties represent that New York law or Wisconsin law could apply in this case, but neither party claims that there is a meaningful difference or that the Panel could have

erred by applying one instead of the other. Thus for purposes of this Opinion, the Court will refer solely to New York law.

ducing the well-capitalized Baird to become an intermediary in the chain not only facilitated the transaction; it also would have insulated Wedbush from the risk of loss caused by the GENI scheme collapsing.

In any event, any evaluation of scienter, as with the other elements, would have involved the credibility of witnesses, including Giuca, CFO Allman–Ward, and CEO Ed Wedbush. The Panel was entitled to base a finding of scienter on observations of their demeanor and to find them lacking in credibility. Even in a manifest disregard of the evidence inquiry, such a finding would be beyond the Court's power to review. *See Campbell,* 21 F.Supp.2d at 345; *see also Ganguly,* 2004 WL 213016, at *4. Finally, the Panel could have found reasonable reliance and could reasonably have concluded that Wedbush's failure to disclose material facts proximately caused Baird's involvement in the June 18 Loan.

■ Even if the Panel found that the elements of fraud were not established, it still could have based its decision on the other fraud-related arguments including aiding and abetting fraud. Aiding and abetting required a showing (1) of wrongful conduct by a primary wrongdoer (D'Angelo), (2) that Wedbush had knowledge of, or acted with reckless disregard of, the wrongful conduct, and (3) that Wedbush substantially assisted the primary wrongdoer. *See, e.g., Liberman v. Worden,* 268 A.D.2d 337, 701 N.Y.S.2d 419, 420 (1st Dep't 2000) (requiring evidence of knowledge and substantial assistance for claim of aiding and abetting misappropriation of bank customer's funds). The Panel could have found each of these elements based on the extensive evidence of, among other things, Wedbush's involvement in the scheme, including altering marks, floating excessive amounts of stock, and coordinating with a D'Angelo employee to include Baird in the June 18 Loan.

Finally, the Panel also could have found for Baird on the other affirmative defenses of *in pari delicto,* illegality of contract, and breach of the covenant of good faith and fair dealing. A decision under these defenses could have been based more generally on the equities of the situation, where Wedbush sought to facilitate and profit from D'Angelo's illegal scheme and then conceal the scheme while positioning Baird to bear any losses from a collapse of the GENI stock and MJK. *See Nomura,* 280 F.Supp.2d at 200–02 (discussing defenses of *in pari delicto* and illegality raised in similar case involving broker accused of facilitating GENI scheme). Arbitrator Giordano, for example, questioned whether failing to disclose D'Angelo's involvement in a transaction would be consistent with "high commercial honor" and "just and equitable principles of trade." (R. 2288 (Tr. 2482).) Wedbush's expert responded that it would not be. (*Id.*)

■ In sum, the Panel would have had at least a "colorable justification" for reaching a decision in favor of Baird on any of the fraud-related claims and defenses. *See Willemijn,* 103 F.3d at 13 (internal quotations omitted). Wedbush's attempt to challenge the award based on the totality of the evidence goes beyond the "severely limited" scope of review for manifest disregard, which is not an inquiry into the correctness of the decision. *See Duferco* 333 F.3d at 389; *DiRussa,* 121 F.3d at 821; *Space Systems/Loral,* 164 F.Supp.2d at 404. Even if the Panel misapplied a legal principle or erroneously decided the facts, that would not warrant vacating the award, and there is no basis to find that the Panel erred in any respect. *See Siegel,* 779 F.2d at 892–93; *see also GMS Group,* 326 F.3d at 77 ("[I]t is well established that, under the manifest disre-

gard standard, it requires more than a mistake of law or a clear error in fact finding to disturb an award." (internal quotations omitted)). This is not a situation where the Panel's decision was contradicted by strong and overwhelming evidence or where any explanation, if given, "would have strained credulity." *See Halligan,* 148 F.3d at 204.

Wedbush, therefore, cannot meet its heavy burden in showing that the arbitration award should be vacated on the grounds that the Panel manifestly disregarded the law or the facts. Because the award can be confirmed on the fraud-related grounds, it is unnecessary to evaluate Baird's contract defenses that it was merely an agent of MJK or that the MSLA did not apply to the transaction between Baird and Wedbush.

### Conclusion

For the foregoing reasons, Wedbush's petition to vacate the arbitration award is **denied**, and Baird's cross-petition to confirm the arbitration award is **granted**. The Clerk is directed to enter Judgment and to close this case.

**SO ORDERED.**