**NOMURA SECURITIES INTERNATIONAL, INC., Plaintiff,**

v.

**E\*TRADE SECURITIES, INC., Defendant.**

**No. 01 Civ. 9280(RWS).**

United States District Court, S.D. New York.

Sept. 4, 2003.

As Amended Sept. 19, 2003.

Dreier & Baritz LLP, New York, NY, for Plaintiff, By: Marc S. Dreier, Amianna Stovall, of counsel.

Morgan, Lewis & Bockius LLP, New York, NY, for Defendant, By: Christopher P. Hall, John G. Moon, David G. Rizzo, of counsel.

Munger, Tolles & Olson LLP, Los Angeles, CA, for Defendant, By: Marc T.G. Dworsky, of counsel.

## *OPINION*

SWEET, District Judge.

Plaintiff Nomura Securities International, Inc. ("Nomura") has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, and defendant E*Trade Securities, Inc. ("E*Trade") has cross-moved for partial summary judgment. Additionally, E*Trade moves to modify Magistrate Judge Michael H. Dolinger's May 20, 2003 Report and Recommendation (the "Report"), or in the alternative, for leave to amend its pleadings.

For the reasons set forth below, Nomura is granted partial summary judgment, and E*Trade's objections to the Dolinger Report are sustained in part. E*Trade is granted leave to amend its pleadings to add the affirmative defenses of illegality and fraudulent inducement and a fraud counterclaim, which is not compulsory. Discovery will be extended, if necessary, following a pretrial conference. State-

ments in the Dolinger Report will not be struck as "gratuitous."

## Prior Proceedings

This action commenced on October 22, 2001 when Nomura filed its complaint, and it was initially assigned to the Honorable Allen G. Schwartz. Nomura first sought a temporary restraining order and preliminary injunction, but on November 6, 2001, Nomura agreed to withdraw its motion for an injunction "in exchange for an understanding that discovery would be expedited, and that a merits determination of its claims would be rendered with some promptitude." (Report at 4.) Discovery was initially to be completed by February 1, 2002, and then extended to February 28, 2002, with expert discovery till March 18, 2002.

On February 15, 2002, E*Trade moved for leave to amend its answer and counterclaims, based on evidence uncovered through the limited discovery in this case and through third-party discovery from Deutsche Bank in a separate lawsuit, and for an extension of the discovery period. This motion was briefed before Magistrate Judge Dolinger.

In March 2002, the discovery period closed, and the parties moved for summary judgment in June 2002.

Based on its discovery, E*Trade, along with the SPIC Trustee of MJK Clearing, Inc. and broker-dealer Ferris, Baker, Watts, Inc. ("Ferris"), filed omnibus fraud complaints in the District of Minnesota in September 2002. All three suits include claims for securities fraud, RICO, and common law fraud. E*Trade and Ferris included Nomura as a defendant in the suit.

On October 18, 2002, Nomura sought a temporary restraining order and preliminary injunction from this Court to enjoin E*Trade from pursuing its Minnesota action against Nomura. Nomura argued that E*Trade's fraud-based claims were compulsory and could be brought only in the instant action. Nomura's motion was denied without prejudice on October 23, 2002, and E*Trade was asked to hold in abeyance its claim against Nomura in the District of Minnesota, pending resolution of the instant motions. This was upon the representation that "the time period will be limited"—"a couple of weeks" for the resolution of the motion to amend and "a couple of weeks" to decide the summary judgment motions.[1] (Oct. 23, 2002 Hearing before Judge Schwartz at 23, 35.)

After Judge Schwartz's untimely death, on April 16, 2003, the case was reassigned to this Court. On May 20, 2003, Judge Dolinger issued his Report and Recommendation, denying E*Trade's motion to amend and reopen discovery for seven months. The summary judgment motions and E*Trade's objections to the Dolinger Report were heard and marked fully submitted on June 25, 2003.

## The Parties

Nomura is a corporation organized and existing under the laws of the State of New York, with a principal place of business located at 2 World Financial Center, Building B, New York, New York. Nomura has temporarily relocated its principal place of business to 25 Corporate Park

---

1. At the October 23, 2002 hearing on Nomura's motion, the parties agreed that Nomura's time to respond to the Minnesota complaint would be extended until November 22, 2002, by which time Judge Schwartz believed that all pending motions in this case would be resolved, thereby obviating the need to rule on Nomura's motion for relief. On November 18, 2002, with these motions still undecided, Judge Schwartz granted Nomura "additional time to respond to the Minnesota Complaint, should that become necessary, to and including 20 days after this Court rules on all outstanding motions."

South, Piscataway, New Jersey. Nomura conducts business as a registered broker-dealer within the meaning of the Securities and Exchange ACT of 1934, as amended (the "1934 Act").

E*Trade is a corporation organized and existing under the laws of the State of California, with a principal place of business located at 4500 Bohannon Drive, Menlo Park, California. E*Trade conducts business as a registered broker-dealer within the meaning of the 1934 Act.

Jurisdiction is proper, pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy is in excess of $75,000.00 exclusive of interest and costs.

### The Facts

The facts are set forth based upon the parties' submissions and Judge Dolinger's Report and Recommendation.

Both Nomura and E*Trade are broker-dealers, who engage in the business of borrowing and lending securities. On or about March 16, 1999, Nomura and E*Trade entered into the standard industry Master Securities Loan Agreement ("MSLA"), which "sets forth the terms and conditions under which one party ('Lender') may, from time to time, lend to other party ('Borrower'), certain securities against a pledge of collateral."

Under the terms of the MSLA, the Borrower must secure the loan of any securities it borrows by providing the Lender with collateral equal to the full market value of the securities. (MSLA § 3.) The parties further agreed to mark the loans to market, so that as the market price of the borrowed securities fluctuates, adjustments are made in the amount of collateral posted. (MSLA § 8.1.) Additionally, the Borrower can return any borrowed securities and terminate the loan "on any Business Day by giving notice to the Lender

and transferring the Loaned Securities to the Lender before the Cutoff Time on such Business Day. . . ." (MSLA § 5.) The Lender must then immediately return the Borrower's collateral. *Id.* Nomura and E*Trade specified in the MSLA that each is acting as principal on all transactions, thereunder, unless expressly stated otherwise in a specified written form. (MSLA § 9.4.)

Between April 30 and June 7, 2001, Nomura borrowed 2,455,000 shares of GenesisIntermedia, Inc. ("GENI") common stock shares from MJK Clearing, Inc. ("MJK"), a Minnesota broker-dealer. However, sometime between June 7 and June 21, Nomura informed Thomas Brooks ("Brooks"), who was then the manager of the Stock Loan Department at MJK, that Nomura needed to reduce its credit exposure with MJK and, therefore, needed to unwind the loan and have its cash collateral returned. Nomura was still prepared to borrow GENI shares, but only from a lender with more available credit than MJK. E*Trade was identified as such a candidate.

On June 21, 2001, MJK loaned the 2,455,000 GENI shares to E*Trade, and E*Trade, in turn, loaned the GENI shares to Nomura. Nomura, in exchange, paid E*Trade $41,735,000.00 in cash collateral. On September 21, 2001, as the price of GENI shares was declining, Nomura returned 805,900 of the borrowed GENI shares to E*Trade, and E*Trade returned the corresponding cash collateral to Nomura. Thus, Nomura remained with 1,649,100 GENI shares and E*Trade remained with $14,841,900 cash collateral—the equivalent of $9.00 per share, the market value of the stock at the time.

On September 25, 2001, the price of GENI shares dropped precipitously, and NASDAQ halted trading. GENI was worth $5.90 per share at the time. At the

close of trading, Nomura marked its GENI shares down to $6.00 per share based on this last market price. E*Trade initially rejected the mark, but accepted it on September 27, 2001.

On September 26, 2001, MJK declared its insolvency and was placed into liquidation under the Securities Investor Protection Act. Nomura sought to return its remaining 1,649,100 GENI shares to E*Trade. E*Trade refused to take the shares and to release the remaining collateral, which then totaled nearly ten million dollars.

From October 15, 2001 to October 18, 2001, E*Trade attempted to mark the GENI shares up to $9.00 per share, although the market price had never risen above the $5.90 price when trading was halted on September 25. Nomura rejected these marks.

Nomura contends that the MSLA obligated E*Trade to accept its remaining GENI shares and return the collateral and that E*Trade's refusal to do so constituted a breach of contract.

In its original and amended answer, E*Trade responded that the MSLA did not apply to the GENI transaction with Nomura because E*Trade was merely facilitating a "run-through" or "pass-through" loan, a standard industry practice, between Nomura and MJK. Nomura alleged that the stock loan agreement was between MJK and Nomura, and E*Trade was MJK's agent, a mere intermediary. According to E*Trade, since MJK declared insolvency before Nomura sought to return its remaining GENI shares,

E*Trade could refuse to process the transaction, and E*Trade did not have a duty to guarantee MJK's obligations.

E*Trade also asserted counterclaims for conversion, money had and received, and unjust enrichment against Nomura. These counterclaims were premised on Nomura having "marked to market" its remaining shares, a transaction that, because of the rapidly declining price of the GENI shares, resulted in a transfer of nearly five million dollars from E*Trade's Depository Trust Company ("DTC") in late September 2001. E*Trade contends that Nomura's action was improper because it knew that MJK was in the middle of financial collapse and would be unable to come up with the cash to reimburse E*Trade for the monies withdrawn from its account to pay Nomura.

In its February 15, 2002 motion to amend its pleadings, E*Trade desired to: (1) assert a new counterclaim of common-law fraud against Nomura; (2) add an affirmative defense of in *pari delicto;* and (3) add a series of fraud and other third-party claims against a number of individuals and entities.[2] E*Trade claimed to have discovered evidence that the transactions at issue here "were but a small part of a market manipulation scheme perpetrated by traders at Nomura and elsewhere" and that the scheme is under active investigation by a federal grand jury in the Central District of California, as well as by the SEC and NYSE. (4/24/03 E*Trade letter to Judge Sweet.) Nomura is itself under investigation by the NYSE in connection with the GENI transactions.[3] Additional-

---

**2.** E*Trade ultimately filed suit against the third-parties in Minnesota and no longer seeks their participation as defendants here.

**3.** A March, 2002 letter sent to Nomura by Kenneth Bozza, Senior Special Counsel of the NYSE, states that the NYSE is "conducting a

preliminary investigation into the transactions involving Genesis Intermedia, Inc." and that "[t]he focus of this investigation is transactions entered into by Nomura Securities International, Inc.'s ... Stock Loan Department."

ly, Nomura is defending a GENI fraud case, initiated last year by Pax Clearing, Inc. in the NYSE Department of Arbitration. In that Arbitration, Nomura admitted the existence of "fraud involving the principals connected with GenesisIntermedia, Inc." (E*Trade's Objections at 6.)

E*Trade claims to have learned that Nomura had borrowed numerous large blocks of GENI shares, collectively involving more than all the shares available to the entire investing public—the "public float" of GENI. E*Trade alleges that Nomura had vastly superior knowledge respecting the risks of the transactions at issue, which it failed to disclose to E*Trade, and that Nomura deliberately contrived E*Trade's involvement in the transaction to mitigate its own potential exposure.

### Other Related Proceedings

Besides the Minnesota action, several other proceedings pertain to this case. In October 2001, E*Trade filed a lawsuit in the District of New Jersey against the now-defunct Native Nations for supplying a large quantity of GENI shares to MJK in the Spring of 2001. E*Trade presses securities and common-law fraud claims against Native Nations for illegally and fraudulently arranging for the distribution of the GENI shares through MJK, to E*Trade's ultimate detriment.

According to E*Trade, after receiving the GENI shares from Native Nations, MJK, in turn, transmitted some of them to E*Trade for the purpose of undertaking two pass-through loan transactions, utilizing it as a conduit. One of these was with Nomura, and it is that transaction that led to the current lawsuit. The other was with Wedbush Morgan Securities, Inc. ("Wedbush"), which has reportedly sued E*Trade in California state court, later removed for NYSE arbitration, to recover its cash collateral for the GENI shares.[4] Nomura further notes that "[s]till another action is pending against E*Trade before a fifth tribunal, the United States District Court for the Eastern District of Pennsylvania, entitled *Fiserv Sec., Inc. v. E*Trade Sec., Inc.*, Civ. A. No. 01–CV–5045, and involving allegations against E*Trade similar to those asserted by Wedbush and Nomura." (Nomura's Mem. in Support of TRO at 9 n. 6.)

Additionally, the SEC has commenced a civil proceeding against Brooks of MJK for failing to collect marks owed to MJK by Native Nations on conduit transactions involving Imperial Credit bonds and GENI common stock. *SEC v. Brooks*, Civil Action No. 03–3319 (D. Minn. filed June 3, 2003). The SEC alleges that "Brooks' failure to collect marks owed to MJK while paying marks owed to other broker-dealers created significant harm to MJK's financial health." *Id.* ¶ 19. The SEC, moreover, alleges that "Brooks was motivated to commit fraud for personal gain. Native Nations promised to, and did, pay MJK higher rebates on the Imperial Credit bonds and GENI common stock in ex-

---

**4.** Robert W. Baird & Co., Inc. ("Baird") was also approached by MJK in the summer of 2001 to participate in a transaction involving GENI securities with Wedbush. When the stock price of GENI collapsed and Wedbush tried to return its GENI shares to Baird, Baird refused to accept them and return Wedbush's collateral. Wedbush filed suit against Baird in the Los Angeles Superior Court, and the action was subsequently removed for NYSE arbitration. In *Robert W. Baird & Co.,* *Inc. v. Wedbush Morgan Secs., Inc.*, No.2001–009431 (N.Y.S.E. July 14, 2003), the NYSE ruled: "An award is granted in favor of claimant Baird that it does not have to accept the delivery of the Geni shares from respondent and does not have to pay respondent $7.965 million, and a permanent injunction prohibiting Wedbush from attempting to deliver the Geni shares to Baird is granted. All other claims of Baird are denied. All counterclaims of Wedbush are denied."

change for Brooks not collecting the marks against Native Nations." *Id.* ¶ 22.

## I. Summary Judgment

### A. The Summary Judgment Standard

Summary judgment is granted only if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see generally* 6 James Wm. Moore, et al., Moore's Federal Practice ¶ 56.15 (2d ed.1983). The court will not try issues of fact on a motion for summary judgment, but, rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. *Bickhardt v. Ratner*, 871 F.Supp. 613 (S.D.N.Y.1994) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Thus, "[s]ummary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." *Richardson v. Selsky*, 5 F.3d 616, 621 (2d Cir. 1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 57 (2d Cir.1997).

### B. E*Trade is Liable under the MSLA

■ The MSLA is the governing agreement in this case. Nomura only enters into stock loan transactions when there is an executed loan agreement,[5] and the 1993 version of the MSLA was the only written agreement entered into between E*Trade and Nomura. The MSLA sets forth "the terms and conditions under which one party ... may, from time to time, lend to the other party ... certain securities against a pledge of collateral." (MSLA at 1.)

■ Between June 21 and September 25, 2001, the parties fully adhered to the requirements of the MSLA, regarding the delivery of shares and cash collateral. As previously held, "When one party performs under the contract and the other party accepts his performance without objection, it is assumed that this was the performance contemplated by the agreement." *Benevento v. RJR Nabisco, Inc.*, No. 89 Civ. 6226, 1994 WL 577010, at *2 (S.D.N.Y. Oct.20, 1994).

The MSLA contains no description of a "run through," and there is no documented evidence that the transaction at issue is a "run through" and that the MSLA does not apply.

E*Trade's failure to return Nomura's cash collateral is a violation under the MSLA. Pursuant to Section 5 of the MSLA, Nomura had the unilateral right to

---

**5.** There is further evidence, although disputed by E*Trade, that E*Trade likewise can only enter into stock loan transactions pursuant to a written agreement. Santina Tr. at 51:4–18; Johnson Tr. at 80:15–22; Stovall Decl., Ex. 3 at ET 2702, 4 at ET 3118–3119, and 6 at ET 2333–2333.

return GENI shares, and pursuant to Sections 5 and 3.3 of the MSLA, E*Trade was then obligated to return the cash collateral to Nomura. E*Trade's failure to return the cash collateral constitutes an event of default under Section 11.2 of the MSLA. E*Trade further failed to pay Nomura a monthly collateral fee, as required under Section 4.1 of the MSLA.

### 1. *The Lack of Oral Communication between E*Trade and Nomura is Immaterial*

■ E*Trade contends that the MSLA is inapplicable to the transaction at issue because E*Trade had no oral communications with Nomura initiating the transaction. E*Trade bases this contention on Section 1.1 of the MSLA, which provides:

> Subject to the terms and conditions of this Agreement, Borrower or Lender may, from time to time orally seek to initiate a transaction in which Lender will lend securities to Borrower. Borrower and Lender shall agree orally on the terms of each Loan, including the issuer of securities, the amount of securities to be lent, the basis of compensation, and the amount of Collateral to be transferred by Borrower, which may be amended during the Loan.

This provision is intended to be permissive rather than mandatory, using "may" instead of "must." As E*Trade itself concedes, it is illogical to interpret the MSLA to preclude written communication, which is inherently more reliable than oral communication, as a means for initiating a stock loan transaction. (E*Trade's Reply Mem. at 3 (stating that "the 1993 MSLA certainly *does not require* that all stock loan transactions be initiated and agreed upon orally") (emphasis in original).) Section 1.1 of the MSLA "simply sets up a standardized framework for oral trading to overcome the uncertainty and anxiety counterparties otherwise might have about orally entering into a stock loan transaction involving large amounts of cash." *Id.* Thus, transactions initiated orally must satisfy certain additional requirements, spelling out the issuer, amount of securities to be loaned, basis of compensation, and amount of collateral.

There is no basis in the MSLA to either require all stock loan transactions to be initiated orally or to require oral communications in order to place transaction under its purview. This is especially apparent given that Nomura (and possibly E*Trade) requires a loan agreement in order to enter into any stock loan transaction, not just orally-initiated ones.

E*Trade points to the Guidance Notes for the 2000 MSLA in support of its position. The Guidance Notes state, "This Agreement has been revised to remove the assumption that Loans will always be initiated 'orally.' This [ ] permits the parties to initiate and agree to the terms of a Loan electronically, as well as orally or in writing ..." However, the Notes use the word "assumption," rather than "requirement." Thus, oral communications were never a requirement, but rather the prevailing industry practice. The revision reflects a change in industry practice, where today stock loan transactions are often initiated electronically, instead of through oral or written communications. The Guidance Notes explicitly sanction this electronic initiation of transactions.

In any case, the transaction at issue was initiated orally through communications between E*Trade and MJK. As E*Trade itself alleges, E*Trade delivered GENI shares to Nomura pursuant to phone conversations with Brooks of MJK, during which agreement was reached on the requisite terms of the transaction. Although E*Trade did not speak to Nomura directly, it appears to have viewed MJK as

communicating on Nomura's behalf. Thus, on June 21, 2001, E*Trade wrote Nomura a ticket for a loan of 2,455,000 shares of GENI common stock and submitted it through Loanet. From June 21 to September 25, 2001, all loans and stock shifting ran smoothly as agreed.

### 2. E*Trade Entered into the Transaction with Nomura as a Principal, Not as MJK's Agent

■ E*Trade further contends that it delivered GENI shares as an agent for MJK in a "run-through" transaction, rather than as a principal. However, the Nomura–E*Trade MSLA explicitly provides that each party acts as a principal in all transactions, unless expressly stated otherwise in a specified written form (Annex I). (MSLA § 9.4.) E*Trade's agreement with MJK likewise provides that each party is deemed a principal unless this particular form is executed. No such forms were used in this case.

■ Moreover, between two parties to a transaction, in order for one to act as an agent rather than a principal, the identity of the principal as well as the fact of agency must be disclosed. 2A N.Y.Jur.2d Agency And Independent Contractors § 362 (1998); *Judith Garden, Inc. v. Mapel*, 342 N.Y.S.3d 486, 488 (1973) (holding that "the fact that the agent did not intend to bind [itself] cannot insulate [it] from liability unless there was an actual disclosure of the agency and the name of the principal. This burden is upon the party seeking to escape personal liability."); *Rothschild Sunsystems, Inc. v. Pawlus*, 129 A.D.2d 933, 935, 514 N.Y.S.2d 572, 573 (3d Dep't 1987) ("An agent will be liable as a principal if the fact of the agency relationship is not known by the person with whom the agent deals."); *East River Saving Bank v. Bevona*, No. 94 Civ. 4508, 1995 WL 266944, at *3 (S.D.N.Y. May 5, 1995)

("Under standard principles of agency law, an agent for an undisclosed principal is individually liable on a contract the agent makes with a third party."). Further, "[i]t is not sufficient merely that the third party had means of knowing of the agency situation. Actual knowledge is required." *Special Sections, Inc. v. Rappaport Co.*, 25 A.D.2d 896, 269 N.Y.S.2d 319, 320 (3d Dep't 1966).

Here, E*Trade never informed Nomura that it was acting as an agent for MJK. To the contrary, E*Trade has alleged that it had no conversations whatsoever with Nomura before entering the loan transaction at issue. The documents that Nomura and E*Trade did exchange only confirmed repeatedly that E*Trade loaned the GENI shares to Nomura. Brooks of MJK also testified that E*Trade was not acting as MJK's agent and that MJK never told Nomura that E*Trade was acting as its agent. Brooks' understanding was that all the parties were acting as principals. (Brooks Tr. at 40:18–25 and 60:20–61:12.)

E*Trade further does not establish a customary understanding of agency in a "run-through" transaction. E*Trade's own policies do not contain any description of a run-through as something different from a principal transaction. In fact, E*Trade's Donald Santina ("Santina") admitted that once the stock loan industry learned of E*Trade's contention that it is not a principal in "run through transactions," such business evaporated. (Santina Tr. at 176:24–177:13.)

Additionally, by E*Trade's own account, its obligations to Nomura were not dependent upon MJK's obligations to E*Trade. E*Trade thus responded to activity by Nomura, such as its marking the GENI shares to market, without waiting for MJK.

■ This case differs significantly from *Castro v. Fed. Ins. Co.*, 823 F.Supp. 132, 135 (S.D.N.Y.1993), where the court found that agency was disclosed when the defendant admitted knowing that the agent was working on behalf of the principal and received payment for its services directly from the principal. In the present case, Nomura does not concede any knowledge of agency. "The party claiming that it is an agent has the burden of proving it and generally, the self-serving statements of the purported agent are insufficient." *La Societe Nationale Pour La Recherche v. Shaheen Natural Res. Co., Inc.*, 585 F.Supp. 57, 62 (S.D.N.Y.1983), aff'd, 733 F.2d 260 (2d Cir.). E*Trade does not sustain this burden here.

### 3. E*Trade's Fee Does Not Indicate its Status as Agent

E*Trade's contention that its fee of 12.5 basis points was too small for it to have acted as principal is also without merit. E*Trade did little work here. It did not have to locate securities to be loaned, as a lender must often do, and it did not have to negotiate the terms of the transaction. Rather, the only service E*Trade actually provided was to lend its credit as a principal to the transaction. If, as E*Trade contends, it did not even provide this service, then it is not clear what value it contributed to the transaction and why it should be paid at all.[6]

E*Trade's ability to use the GENI shares was not restricted by the fee. Nothing prevented E*Trade from lending them to any counterparty, (Brooks at 29:23–4, 222:4–7), and there was no obligation on Nomura to accept the delivery of

GENI shares, as Santina himself admitted, (Santina Tr. at 129:11–14).

### C. Affirmative Defenses

Since E*Trade participated in the loan transaction as a principal under the MSLA, its following affirmative defenses must fail:

(i) failure to state a claim;

(ii) failure to join MJK as party;

(iii) E*Trade is not a proper party;

(iv) MJK was the fully disclosed principal to the loan transaction;

(v) Nomura failed exhaust available remedies against MJK.

E*Trade also claims a statute of frauds defense, asserting that there must be a written agreement providing for a guarantee. However, the statute of frauds is inapplicable to this dispute as there is no guarantee at issue here. Nomura does not claim that E*Trade served as MJK's guarantor, but rather that E*Trade violated the terms of their MSLA agreement.

■ As E*Trade itself concedes, unclean hands is an equitable defense and unavailable in an action seeking money damages as in the instant case. *E.g., Aniero Concrete Co., Inc. v. New York City Constr. Auth.*, No. 94 Civ. 3506, 2000 WL 863208, at *10 (S.D.N.Y. June 27, 2000) ("[U]nclean hands is an 'equitable defense to equitable claims,' not to actions at law which seek money damages"). E*Trade thus seeks to substitute this defense with *in pari delicto*, which has been recognized as "analogous to" the doctrine of unclean hands. *Granite Partners, L.P. v. Bear Stearns & Co., Inc.*, 17 F.Supp.2d

---

**6.** Nomura further points to an E*Trade document, disputed by E*Trade, which states the following:

Securities Lending in the United States is, for the most part, an extremely efficient

market. As access to domestic equities has become commoditized, spreads have narrowed, with typical spreads today of between 5 to 25 basis points.

Stovall Decl. Ex. 4 at ET 3112.

275, 310 (S.D.N.Y.1998); *see also 390 West End Assocs. v. Baron,* 274 A.D.2d 330, 711 N.Y.S.2d 176, 178 (1st Dep't 2000) (using the terms "in pari delicto" and "unclean hands" interchangeably); *Nathanson v. Weis, Voisin, Cannon, Inc.,* 325 F.Supp. 50, 53 (S.D.N.Y.1971) (referring to *"in pari delicto,* or its broader equitable counterpart, the doctrine of unclean hands"); *Pinter v. Dahl,* 486 U.S. 622, 632, 108 S.Ct. 2063, 100 L.Ed.2d 658 (1988) ("Contemporary courts have expanded the [*in pari delicto* ] defense's application to situations more closely analogous to those encompassed by the 'unclean hands' doctrine ..."). This *in pari delicto* defense is dealt with below.

### D. *E*Trade's Counterclaims*

■■■ E*Trade further asserts counterclaims against Nomura for conversion, money had and received, and unjust enrichment. "Under New York law, conversion is any act of dominion wrongfully exerted over another person's personal property inconsistent with that person's rights in the property." *Cumis Ins. Soc'y, Inc. v. Citibank, N.A.,* 921 F.Supp. 1100, 1109 (S.D.N.Y.1996). To state a claim for money had and received under New York law, E*Trade must allege that (1) Nomura received money belonging to E*Trade, (2) Nomura benefitted from the receipt of this money, and (3) under principles of equity and good conscience, Nomura should not be permitted to keep the money. *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 125 (2d Cir. 1984). To state a claim for unjust enrichment, E*Trade must allege that Nomura was enriched, that such enrichment was at E*Trade's expense, and that the circumstances are such that in equity and good

conscience Nomura should return the funds to E*Trade. *Dolmetta v. Uintah Nat'l Corp.,* 712 F.2d 15, 20 (2d Cir.1983).

■■■ E*Trade contends that Nomura wrongfully marked GENI shares from $9.00 to $6.00 per share, thereby wrongfully debiting $4,947,300.00 from E*Trade's DTC account. However, Nomura acted in accordance with the MSLA, where the parties agreed to mark the loans to market, so that as the market price of the borrowed securities fluctuates, adjustments are made in the amount of collateral posted. (MSLA § 8.1.) At the time trading was suspended, GENI was worth $5.90 per share.

Furthermore, E*Trade knowingly and affirmatively approved the mark. At the close of trading on September 25, 2001, Nomura attempted to mark the GENI shares to market to $6.00 per share, but E*Trade rejected mark. Nomura then informed E*Trade, both orally and in writing, that it intended to resubmit mark, and on September 27, 2001, E*Trade accepted it. E*Trade's remission of funds thus cannot accurately be described as a "mistake." (E*Trade's Opp. Mem. at 32 n. 13.) E*Trade knowingly accepted Nomura's marking of the GENI shares from $9.00 to $6.00 on September 27, 2001, even though MJK was then insolvent.

Therefore, the $4,947,300 in cash collateral which E*Trade transferred back to Nomura upon Nomura's mark to market rightfully belonged to Nomura. Since no money was wrongfully debited from E*Trade, E*Trade's counterclaims must fail.[7]

---

7. Nomura further contends that New York law precludes a tort action for money damages where a breach of contract action could be brought. (Nomura Mem. at 19–20) (*citing* *Netzer v. Continuity Graphic Assocs. Inc.,* 963 F.Supp. 1308, 1320 (S.D.N.Y.1997); *Long Island Lighting Co. v. Transamerica Delaval, Inc.,* 646 F.Supp. 1442, 1457 (S.D.N.Y.1986)).

■ E*Trade's contention that Nomura violated NASD Rule 3340 by marking the GENI shares to market after NASDAQ had suspended trading in that security is also without merit. NASD Rule 3340 prohibits parties from entering into transactions while trading is halted. Here, there was no transaction, only a mark to market on a prior transaction. Nomura acted in accordance with Rule 3340, as explained by the NASD Guide to Rule Interpretations, regarding the "Marketability of Securities Subject to Trading Suspensions and Trading Halts." The Guide states:

> If a NASDAQ security is suspended by the SEC, a long position in the security should be given no value for either margin or net capital purposes, while a short position should receive the value of the position at the time of the suspension.

Thus, E*Trade's short position in GENI had to receive the same value as it had at time trading was suspended, which was $5.90 per share.

■ As E*Trade's counterclaims are without merit, punitive damages should not be awarded in its favor. In order to recover punitive damages, E*Trade must show that Nomura acted wantonly or maliciously, and that a wrong to the general public is involved. *E.g., Amherst Magnetic Imaging Assoc., P.C. v. Cmty. Blue,* 239 A.D.2d 892, 893, 659 N.Y.S.2d 657, 658 (4th Dep't 1997).

## II. *Judge Dolinger's Report*

E*Trade additionally moves to modify Magistrate Judge Dolinger's May 20, 2003 Report and Recommendation. E*Trade seeks to amend its pleadings to add affirmative defenses and a fraud counterclaim, to extend discovery, and to strike certain "gratuitous" statements in the Report.

### A. *Standard of Review*

Under Fed.R.Civ.P. 72(b), the recommendation of a magistrate judge on a dispositive matter is subject to a *de novo* review by the district judge to whom the case is assigned. A ruling denying a motion for leave to amend for failure to state a claim under Fed.R.Civ.P. 12(b)(6), as Judge Dolinger's report does, is deemed dispositive and reviewed *de novo* under Rule 72(b). *HCC, Inc. v. R H & M Mach. Co.,* 39 F.Supp.2d 317, 321 (S.D.N.Y.1999); *Dais v. Lane Bryant, Inc.,* No. 97 Civ. 2011, 2000 WL 145755, at *1 (S.D.N.Y. Feb. 8, 2000). Magistrate Judge Dolinger further expressly denominated his findings a "report and recommendation," rather than an order, recognizing the dispositive nature of the matter. *American Stock Exch., LLC v. Mopex Inc.,* 215 F.R.D. 87 (S.D.N.Y. 2002). *See also Old Republic Ins. Co. v. Hansa World Cargo Serv., Inc.,* 51 F.Supp.2d 457, 465–66 (S.D.N.Y.1999) (holding that a magistrate judge's report and recommendation is reviewed *de novo* ).

Under the *de novo* standard, the district court makes an "independent determination of a controversy that accords no deference to any prior resolution of the same controversy." *Old Republic,* 51 F.Supp.2d at 466. The district court is not limited to consideration of evidence presented to the magistrate judge, but instead is entitled to review the entirety of the record. Fed.R.Civ.P. 72(b); *Hynes v. Squillace,* 143 F.3d 653, 656 (2d Cir.1998), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

### B. *Leave to Amend Pleadings*

#### 1. *Standard*

Leave to amend is liberally granted. Rule 15(a) of Federal Rules of Civil Procedure provides that leave to amend a pleading "shall be freely given when justice so requires." Fed.R.Civ.P. 15(a). This broad

language encourages courts to adhere to a "policy in favor of granting leave to amend." *Hannah v. Metro–North Commuter R.R. Co.*, 753 F.Supp. 1169, 1176 (S.D.N.Y.1990) (quotations omitted). *See also Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir.1993) ("The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the nonmovant of prejudice or bad faith.") (citations omitted).

However, "amendment is properly denied in appropriate circumstances, such as when the proposed amendment would be futile and when the amendment would unduly prejudice another party." (Report at 14 (*citing Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Koehler v. Bank of Bermuda (New York), Ltd.*, 209 F.3d 130, 138 (2d Cir.2000)).). "[T]he analysis appropriate to an assertion of futility is typically whether the proposed new pleading could survive a dismissal motion under Fed.R.Civ.P. 12(b)(6)." (Report at 14–15 (*citing Lucente v. IBM Corp.*, 310 F.3d 243, 258 (2d Cir.2002); *S.S. Silberblatt, Inc. v. E. Harlem Pilot Block–Bldg. 1 Housing Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir.1979); *Wechsler v. Squadron, Ellenoff, Plesent & Sheinfeld, LLP*, 994 F.Supp. 202, 205–06 (S.D.N.Y.1998)).).

In considering a motion to dismiss pursuant to Rule 12(b)(6), the court should construe the complaint liberally, "accepting all factual allegations in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir.2002) (*citing Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir.2001)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir.1995) (*quoting Scheuer v. Rhodes*, 416 U.S. 232, 235–236,

94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Dismissal is only appropriate when "it appears beyond doubt that the plaintiff can prove no set of facts which would entitle him or her to relief." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir.2000).

## 2. *Delay was Insufficient to Deny Amendment*

As noted by Judge Dolinger, "delay alone is ordinarily an insufficient basis to deny amendment." (Report at 17) (*citing Rachman Bag Co. v. Liberty Mut. Ins. Co.*, 46 F.3d 230, 234–35 (2d Cir.1995).) Parties are routinely "permitted to assert new claims long after they acquired the facts necessary to support such claims … and have even been permitted to amend a complaint on the eve of trial." *Hannah*, 753 F.Supp. at 1176. "[T]he court must look not only to the amount of time that passed before the movant sought to amend, but also to the reasons for that delay and its practical impact on the other side's legitimate interests, including both its ability to respond to new claims or defenses and any other prejudice flowing from a delay in the final adjudication of the case." (Report at 17 (*citing Rachman*, 46 F.3d at 234–35).)

 Here, Judge Dolinger pointed to E*Trade's delay in bringing a motion to amend "at the very conclusion of scheduled discovery." (Report at 29.) The Report further questioned E*Trade's motivations, stating "The timing of the motion—which was later followed by E*Trade's filing of a separate lawsuit involving the same claims and parties, as well as additional defendants, in the District of Minnesota—suggests a motive to delay the outcome here and ultimately to slow the adjudication of the dispute with Nomura over the collateral." (Report at 29–30.) E*Trade explains that it filed the motion to amend when it did because only in light of new evidence

obtained through discovery did it became aware of the true nature of the case. E*Trade further counters that it was forced to file the Minnesota action "because it had not been permitted here to explore its affirmative defenses against Nomura, because Nomura had expressly urged E*Trade to pursue any such affirmative claim against it elsewhere, because it faced a statute of limitations deadline, and because two other very similar lawsuits, including one against Nomura and its affiliates, were being filed in Minnesota at same time." (E*Trade's objections at 21–22.)

There is no question that this case has been marked by considerable delay and much of it through no fault of the parties. Whatever E*Trade's "game plan" (Report at 30 n. 5), E*Trade filed this motion before the close of discovery (filed on February 15, 2002), and it was itself the victim of delay. E*Trade agreed to hold its claims against Nomura in the Minnesota action in abeyance upon the understanding that its motion would be resolved within a matter of weeks. As it was, the discovery period expired and the parties moved for summary judgment before any resolution was reached, and the Dolinger Report came out on May 20, 2003, over a year after E*Trade filed its motion. Furthermore, Judge Dolinger's concerns over the addition of third party defendants at this stage in the proceedings (Report at 30) are now irrelevant since E*Trade no longer wishes to add them. E*Trade's delay in bringing forward this motion is thus insufficient to deny amendment.

### C. *All Evidence Should Be Considered*

E*Trade claims that the Report incorrectly fails to consider key facts E*Trade gathered after February 2002 (the close of discovery was on February 28, 2002 with expert discovery till March 18, 2002). E*Trade argues that the Report should have considered the substantial universe of facts that E*Trade marshaled through third party discovery in other cases, instead of confining its analysis to the evidence that E*Trade was able to muster prior to the close of the discovery period. According to E*Trade, these new facts make up the very core of its case with regards to the fraud allegations. Nomura responds that Judge Dolinger expressly considered and properly rejected E*Trade's amplified allegations. (Nomura Opp. to Objections at 17 n. 11 (citing Report at 13, 27.)) According to Nomura, Judge Dolinger properly concluded that even with this new evidence E*Trade failed to state a fraud claim against it. In any case, E*Trade's pleadings are reviewed *de novo,* and all the evidence in the record is now considered.

### D. *Affirmative Defenses*

E*Trade requests leave to add three new affirmative defenses. The Dolinger Report ignores two of them, illegality and fraudulent inducement, and dismisses the third, *in pari delicto,* on the belief that it falls with E*Trade's fraud counterclaim. (Report at 28 ("The failings of E*Trade's fraud allegations equally undercut this proposed defense.").)

#### 1. *In Pari Delicto*

As the Supreme Court explained, the doctrine of *in pari delicto,* "which literally means 'in equal fault,' is rooted in the common-law notion that a plaintiff's recovery may be barred by his own wrongful conduct." *Pinter,* 486 U.S. at 632, 108 S.Ct. 2063. This defense bars recovery for a plaintiff who is "an active, voluntary participant in the unlawful activity that is the subject of the suit. Plaintiffs who are truly *in pari delicto* are those who have

themselves violated the law in cooperation with the defendant." *Granite Partners,* 17 F.Supp.2d at 308 (*quoting Pinter,* 486 U.S. at 636, 108 S.Ct. 2063). Furthermore, the plaintiff must bear "at least substantially equal responsibility for the underlying illegality." *Pinter,* 486 U.S. at 635–36, 108 S.Ct. 2063.

E*Trade is correct that asserting *in pari delicto* requires "immoral or unconscionable. conduct," not independently actionable conduct. *390 West End,* 274 A.D.2d at 333, 711 N.Y.S.2d 176. In the context of unclean hands, courts have recognized that alleged "misconduct need not necessarily have been of such a nature as to be punishable as a crime or as to justify legal proceedings of any character. Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause ..." *Precision Instrument Mfg. Co. v. Automotive Maint. Mach. Co.,* 324 U.S. 806, 815, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); *accord Pecorella v. Greater Buffalo Press, Inc.,* 107 A.D.2d 1064, 1065, 486 N.Y.S.2d 562, 563 (4th Dep't 1985) (holding that with respect to unclean hands, the misconduct that will bar relief "need not be sufficient to constitute the basis of a legal action").

■ However, E*Trade must show that Nomura was "an active, voluntary participant in the unlawful activity that is the subject of the suit." *Granite Partners,* 17 F.Supp.2d at 308 (*quoting Pinter,* 486 U.S. at 636, 108 S.Ct. 2063). Here, Nomura brought suit to recover for a breach of contract, not for damages caused by the illegal manipulation of GENI stock. Furthermore, E*Trade does not allege Nomura's "cooperation" with it in an illegal scheme. *Granite Partners,* 17 F.Supp.2d at 308 (*quoting Pinter,* 486 U.S. at 636, 108 S.Ct. 2063). *See also Business Foods Serv. Inc. v. Food Concepts Corp.,* 533 F.Supp. 992, 997 (E.D.N.Y.1982) (holding in the unclean hands context that "defendant must show that the plaintiff's participation in the illegal scheme was of the same degree as the defendant's and that the plaintiff's involvement was voluntary and in its own self-interest."). Rather than claiming that its failure to return the cash collateral was part of Nomura's illegal scheme, E*Trade denies any wrongdoing and claims it had no knowledge of the stock manipulation. Thus, *in pari delicto* is an inappropriate defense in this case.

### 2. *Illegality*

E*Trade further argues that even if the MSLA is applicable, it should not be enforced since courts will not permit themselves to be instruments in furtherance of a fraud by enforcing contracts related to that fraud. *Cindy Royce Creations, Ltd. v. Simmons & Simmons,* No. 92 Civ. 9404, 1993 WL 288291, at *5 (S.D.N.Y. July 28, 1993). Even where the contract itself does not explicitly require illegal performance, "the bargain may still be illegal under New York law if it is closely connected with an unlawful act." *United States v. Bonanno Organized Crime Family,* 879 F.2d 20, 28 (2d Cir.1989).

■ E*Trade alleges that the MSLA was instrumental to Nomura's fraudulent scheme and was the means by which Nomura inserted E*Trade between it and MJK as a protective buffer to absorb any losses in the event MJK failed, as Nomura feared it might.[8] Thus, if

---

**8.** E*Trade further argues that performance under the MSLA would require the purchase and sale of unregistered securities in violation of Section 5 of the Securities Act of 1933.

Courts will not enforce contracts in the securities context when performance will violate federal securities statutes. *E.g., Byrnes v. Faulkner, Dawkins & Sullivan,* 550 F.2d 1303,

**202**

E\*Trade can adequately plead the existence of a fraudulent scheme, it should be allowed to amend its pleadings to add this affirmative defense.

Nomura claims that the MSLA could not be illegal because it was not prepared for the purpose of effectuating an illegal scheme. The MSLA is the standard form agreement, which serves the entire industry, and E\*Trade and Nomura entered into this agreement long before GENI transactions were even contemplated. However, it is unnecessary for there to be an intent to violate the laws when an agreement is made. As previously held, if the contract "is opposed to the interests of the public, the agreement is void, even though in the particular case the intent of the parties may have been good." *Anabas Exp., Ltd. v. Alper Indus., Inc.*, 603 F.Supp. 1275, 1278 (S.D.N.Y.1985).

### 3. *Fraudulent Inducement*

▇▇▇▇ Scienter needs to be pled in order to state a fraudulent inducement defense. *E.g., Woo v. Times Enter., Inc.*, No. 98 Civ. 9171, 2000 WL 297114, at \*5 (S.D.N.Y. Mar.22, 2000) ("In order to demonstrate fraudulent inducement . . ., a defendant also must show that the plaintiff knew that the representation was false or made the representation recklessly."); *Keeney v. Kemper Nat'l Ins. Cos.*, 960 F.Supp. 617, 621 (E.D.N.Y.1997) (same).[9]

E\*Trade argues that Nomura falsely induced it to become involved in this transaction by not disclosing its superior knowledge and that the whole point of the transaction was to transfer known risks to E\*Trade without E\*Trade's knowing consent. According to E\*Trade, had Nomura disclosed its true role in the GENI transaction and its ongoing involvement in the lending and borrowing of the entire public float of GENI stock, E\*Trade would not have agreed to participate in the transaction at any price. Again, if E\*Trade's fraud pleading is adequate, it should be allowed to amend its pleadings to add this affirmative defense.

### E. *Fraud Counterclaim*

#### 1. *E\*Trade's Fraud Counterclaim is Not Compulsory*

E\*Trade's fraud counterclaim against Nomura is not compulsory and may well be appropriately litigated in the district court of Minnesota. Dolinger's Report declines to address the question of whether or not E\*Trade's counterclaim is compulsory,[10] stating "We need not enter that

---

1313 (2d Cir.1977). However, E\*Trade cites no authority demonstrating that a loan of GENI shares constitutes a sale of securities for purposes of Section 5. Furthermore, E\*Trade must demonstrate that this was a public, as distinct from private sale, which is exempt from the Act.

9. The cases cited by E\*Trade point to a cause of action for rescission on the ground of innocent misrepresentation. This cause of action does not require scienter. The representation need only be "material" and "justifiably relied upon." *W. Side Fed. Savings & Loan Ass'n of N.Y. City v. Hirschfeld*, 101 A.D.2d 380, 476 N.Y.S.2d 292, 294 (1st Dep't 1984). Thus, the New York Supreme Court explained, "If we subtract from fraud the element of *scienter*, the remainder constitutes the tort of innocent misrepresentation." (emphasis in original). *See also Stern v. Satra Corp.*, 539 F.2d 1305, 1308 (2d Cir.1976) ("New York law . . . is well settled that an innocent misrepresentation of a material fact permits rescission even though made without an intent to deceive.").

10. During the course of this litigation, both parties have switched their positions with regards to the compulsory nature of E\*Trade's counterclaim. E\*Trade initially maintained it to be compulsory, but now it holds that it is not, while Nomura initially maintained that it was not compulsory, but now it holds that it is. Nomura thus originally requested that E\*Trade's counterclaims be severed because

thicket, since ... the claim as pled is defective." (Report at 30 n. 6.) However, it goes on to state, "if E*Trade can successfully plead a viable claim against Nomura, common sense dictates that the claim be heard in the Minnesota court." *Id.*

■ Under Fed.R.Civ.P. 13(a), "A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against the opposing party, if it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties of whom the court cannot acquire jurisdiction." A claim is compulsory when "the essential facts of the claim are 'so logically connected that considerations of judicial economy and fairness dictate that all issues be resolved in one lawsuit.'" *Adam v. Jacobs*, 950 F.2d 89, (2d Cir.1991) (*quoting United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir.1979)). Thus, E*Trade's claim would not be compulsory here unless it is so factually connected to this action that it would be unfair and inefficient to decide it anywhere else.

Nomura's action against E*Trade is a "straightforward contract action" based on the MSLA. (Report at 27, 29; Nomura's Opp. to Objections at 1, 3.) In its fraud counterclaim, E*Trade, however, is maintaining that Nomura's role in the fraud extended "well beyond" the single transaction at issue in Nomura's complaint and involved many additional participants and a significantly broader time frame. E*Trade thus initially sought to add a number of third-party defendants in its amended pleadings, including GENI, Ultimate Holdings, Adnan Khashoggi, Rami El–Batrawi, and ten John Does. By the time the Dolinger Report addressing E*Trade's motion to amend came out, however, E*Trade already filed suit against the third-parties in Minnesota and no longer seeks their participation here.

At this point, litigation has already started in Minnesota, E*Trade has been pursuing its fraud claim against other defendants in Minnesota, and parallel litigation against Nomura is proceeding by Ferris.[11] As the Dolinger Report concludes, "Litigation economy and judicial efficiency will both be enhanced by requiring E*Trade to pursue such fraud claims in only one forum, and to do so in the district in which all potential parties have already been named, that is, in Minnesota." (Report at 27–28.) The Second Circuit stated in *Critical–Vac* that "if judicial economy is promoted by severing two claims and trying them separately, it would seem inappropriate and illogical to regard either claim as a compulsory counterclaim to the other and require consolidation." *Critical–Vac Filtration Corp. v. Minuteman Int'l Inc.*, 233 F.3d 697, 703 (2d Cir.2000) (citations omitted), *cert. denied*, 532 U.S.

"the claims ... present questions of fact and law distinct from the main action, such that a single action would lead to confusion, delay, additional expense, or undue prejudice." (E*Trade's Objections at 11 (quotations omitted).)

**11.** Cases regarding the GENI scheme in the District Court of Minnesota are the following:

1) *James P. Stephenson, Liquidating Trustee of MJK Clearing, Inc. v. Deutsche Bank AG, et al.*, No. 02–CV–4845 (D. Minn. filed Sept. 19, 2002);
2) *Ferris, Baker Watts, Inc. v. Deutsche Bank AG, et al.*, No. 02–CV–3682 (D. Minn. filed Sept. 21, 2002);
3) *E*TRADE Securities LLC v. Deutsche Bank AG, et al.*, No. 02–CV–3711 (D. Minn. filed Sept. 25, 2002); and
4) *Osher v. GenesisIntermedia, et al.*, 03–CV–3471 (D. Minn. filed Oct. 25, 2001) (class action alleging a fraudulent scheme to manipulate GENI stock).

1019, 121 S.Ct. 1958, 149 L.Ed.2d 754.[12] Moreover, parallel litigation of essentially the same fraud claim in two separate actions threatens not only wasteful duplication of effort, but also the prospect of inconsistent adjudications. *Schonberger v. Serchik,* No. 89 Civ. 7094, 1991 WL 167259, at *2 (S.D.N.Y. Aug.22, 1991) ("Not only would judicial resources be squandered if these claims were litigated twice, but separate trials would create a danger of inconsistent outcomes.").

Although E*Trade's counterclaim does not arise "out of the transaction or occurrence that is the subject matter" of Nomura's claim, Fed.R.Civ.P. 13(a) there are overlapping issues of fact in E*Trade's fraud counterclaim and E*Trade's newly proposed affirmative defenses to Nomura's action, as both parties concede. (June 25, 2003 Hearing before Judge Sweet at 10, 16.) However, due to the unique procedural posture and delay involved in this case, through no fault of the parties, it may make sense to have the fraud counterclaim tried in Minnesota with the other defendants, an issue to be explored in the pretrial conference to be held shortly. As Judge Dolinger noted, "[A]lthough it is theoretically possible that E*Trade might be able to plead a cognizable claim against Nomura, we see no basis for inviting another effort by it to amend in this forum. . . . E*Trade has asserted the same fraud counterclaim in its lawsuit in Minnesota, and in that proceeding it has named all of the alleged co-conspirators as defen-

dants." (Report at 27.) Thus, as long as E*Trade can properly allege a fraud claim, it can assert the affirmative defenses of illegality and fraudulent inducement here. Discovery in both actions may have to be coordinated regarding some of the facts, but their legal significance will be distinct for the purposes of E*Trade's claims and defenses.[13]

## 2. *Fraud Standard*

■ "To assert a claim for fraud under New York law, the pleader must allege that the wrongdoer made a material false representation, that the speaker intended to defraud the claimant by that false statement, that the pleader reasonably relied on the representation, and that he suffered injury as a proximate result of that reliance." (Report at 20 (*citing Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995); *New York Islanders Hockey Club, LLP v. Comerica Bank–Texas,* 71 F.Supp.2d 108, 116 (E.D.N.Y.1999)).) In this case, E*Trade seeks to assert a claim against Nomura for fraudulent omission. "To plead such a claim E*Trade must allege all of the elements of a fraud claim, except that, in lieu of alleging an affirmative misrepresentation, it must allege an omission by Nomura of material facts that Nomura had a duty to disclose to it." *Id.* (*citing Brass v. American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993)).

---

**12.** In the *Critical–Vac* case, the Second Circuit further considered it significant whether the party alleged "any facts that arose" after the filing of its answer in the first litigation. *Id.* at 700. It points out that "all these facts were not only known to [the party], they were pleaded in the first action and specifically dealt with in the decision of [that] court." *Id.* (citations omitted). This is in direct contrast to what has happened in the instant case where E*Trade claims to base its proposed

counterclaim and affirmative defenses on new facts uncovered during discovery and in related actions.

**13.** E*Trade's Minnesota complaint additionally pleads claims under federal securities law, RICO, and Minnesota protection law—each of which require the adjudication of numerous legal issues that are not implicated by E*Trade's affirmative defenses.

Again, for the purpose of this motion, E*Trade's claim must be construed liberally, "accepting all factual allegations ... as true, and drawing all reasonable inferences in [E*Trade's] favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citations omitted). *See also* (Report at 15 ("[W]e must assume the truth of the well-pled factual allegations of the claim and must draw all reasonable inferences against Nomura.... [T]he counterclaim may be deemed legally insufficient 'only where it appears beyond doubt that the [pleader] can prove no set of facts in support of his claim[s] which would entitle him to relief.'") (*citing inter alia Woodford v. Cmty. Action Agency of Greene County, Inc.*, 239 F.3d 517, 526 (2d Cir.2001)).

### a. *Duty to Disclose*

 Thus, the first element is "a duty to disclose." E*Trade argues that Nomura had a duty to disclose, arising from its superior knowledge of material facts. *See Brass,* 987 F.2d at 151 ("It is no longer acceptable, if it ever was, to conclude in knowing silence, a transaction damaging to a party who is mistaken about its basic factual assumptions when ... he would reasonably expect a disclosure.") (quotations omitted). Such an obligation will arise in a business transaction if: "(1) one party has superior knowledge of certain information; (2) that information is not readily available to the other party, and (3) the first party knows that the second party is acting on the basis of mistaken knowledge." *Banque Arabe,* 57 F.3d at 155 (*citing Brass,* 987 F.2d at 150).

 E*Trade adequately alleges this superior knowledge. E*Trade alleges that Nomura borrowed more GENI shares than were in the public float, as corroborated in an email from Scott Reed ("Reed") of Nomura Canada[14] to Robert Lakeman, a co-worker in New York, in which he gloated, "We have almost the entire issuance of [GENI] on our books." Since Nomura knew its holdings exceeded the public float, it could reasonably conclude that the only possible source of GENI stock was from compulsory insiders, who were not permitted to loan stock. E*Trade further alleges that Nomura knew GENI's stock was inflated and that MJK was undercapitalized and would eventually be unable to mark the GENI shares to market and collapse.

Not only does E*Trade claim that Nomura had superior knowledge, but that it was an active participant in the manipulation of GENI stock. According to E*Trade, Nomura, its affiliates, and their employees worked intentionally to channel funds illegally to GENI insiders and to manipulate the price of GENI stock. In support of its contentions, E*Trade points to an NYSE investigation of Nomura's GENI transactions and to Reed, who has been identified as a key witness and as one of the three "quarterbacks" of the GENI scheme. (St. John Decl., Ex. 4 at 150:10–151:16.) Reed's close business and social relationship with the other two "quarterbacks," including convicted felon Kenneth D'Angelo, is corroborated by multiple recorded telephone conversations. E*Trade alleges that these conversations demonstrate that Reed's superiors at Nomura understood the company to be engaging in illegal conduct.[15]

14. Read nominally worked for Nomura Canada, but was hired and supervised by Nomura's U.S. management.

15. E*Trade further claims that taped conversations show that Anthony Venditti, ("Venditti") the head of Nomura's stock loan department and Nomura's designated 30(b)(6) witness, was the one who hired Reed away from Maple Partners to Nomura Canada and that he made frequent trips to Canada, meeting and socializing with him.

According to E*Trade, Nomura knew that insiders never intended to return cash received in exchange for loans and thus GENI loans were disguised sales. Nomura, therefore, reconfigured its GENI holdings, carving it into smaller pieces and re-routing it through unsuspecting intermediaries, like E*Trade, who would not realize the size of Nomura's stake or that shares came from GENI insiders. That way when the insiders failed to perform on their loan obligations, intermediaries would be set up to take the fall. E*Trade claims that Nomura was by and large successful in insulating itself, reducing its position in GENI from 4,670,900 shares on September 21, 2001 to 1,649,100 shares on September 26, 2001. The remaining shares are the shares that Nomura attempted to return to E*Trade on September 26, 2001, making up the transaction at issue in this case.

The Dolinger Report finds it significant that Nomura did not escape the series of transactions completely unscathed. (Report at 25.) However, as E*Trade points out, Nomura came close, and if it is successful in this lawsuit, it will have entirely succeeded. E*Trade further alleges that Venditti ordered all GENI positions "zeroed" on September 20, 2001. Many positions were closed on September 21, and Venditti expected the rest to be cleared by September 24, one day before the scheme collapsed. E*Trade thus adequately alleges Nomura's superior knowledge.

█ Additionally, for the duty to disclose to apply, information must not be "readily available to the other party." *Banque Arabe*, 57 F.3d at 155. A claim will falter where the facts at issue are publicly available, or were in fact disclosed to the plaintiff through other means. *Aaron Ferer & Sons, Ltd.*, 731 F.2d at 123–24. Nomura argues that information about the public float of GENI stock was not exclu-

sive to Nomura, or, at the very least, E*Trade should have alleged that it had attempted to access this information. However, E*Trade would have no reason to suspect that the GENI shares were not lendable or that an illegal transaction was taking place. Furthermore, as an alleged insider to the GENI fraud, Nomura would have had access to information regarding to the stock manipulation that would have been unavailable to E*Trade. Where, as here, the defendant is alleged to have withheld facts about its own transactions, the plaintiff's lack of ready access to that information is presumed. *Doehla v. Wathne, Ltd.*, No. 98 Civ. 6087, 1999 WL 566311, at *16 (S.D.N.Y. Aug.3, 1999) ("By its nature, this information is of the type that was in defendants' possession, not at [plaintiff's] fingertips, and which, one can envision, defendants would have desired to keep close to the chest. It takes no great leap of logic to infer from the complaint's allegations that the information was not equally accessible to both plaintiff and defendants, despite the lack of allegations precisely addressing that question.").

█ Finally, Nomura must be aware that E*Trade was relying on mistaken information. E*Trade has alleged that it would not have entered into the transaction, nor would it have been reasonable to do so, had it been aware that Nomura's overall position exceeded the public float, that Nomura was trading in insider shares, or that GENI shares were not legally lendable. Since E*Trade could not reasonably have entered the transaction had it known the true facts, Nomura is chargeable with knowledge of E*Trade's ignorance. *Brass*, 987 F.2d at 152 (holding that an allegation that the defendant "surely knew that if [the plaintiffs] were informed of the restrictions," they would never have considered a purchase of the securities, was sufficient to survive a motion to dismiss).

### b. *Scienter*

■ To plead fraud adequately, E*Trade must also make a showing of scienter, or Nomura's intent to defraud it. *Brass.* 987 at 152. Although a plaintiff need not allege scienter in detail, it must allege facts that are at least suggestive of an intent to defraud. This may be done either by alleging a motive for the commission of a fraud or by identifying "circumstances indicating conscious behavior by the defendants." *Id.* at 152–53.

■ E*Trade meets this standard, alleging facts constituting strong circumstantial evidence of conscious behavior by Nomura. The facts indicate Nomura's awareness that it was dealing in insider shares, rather than shares from the public float. By re-routing its massive GENI holdings among several intermediaries, Nomura saw to it that none of the intermediaries would realize the size of Nomura's stake and that shares came from GENI insiders. *Cf. United States v. Nersesian,* 824 F.2d 1294, 1312–13 (2d Cir.1987) (defendant criminally liable for dividing currency transaction into several smaller transactions in order to conceal its true magnitude and thereby evade reporting requirements).

### c. *Reasonable Reliance*

If Nomura failed to disclose certain material facts to E*Trade, E*Trade would have no way of knowing this, and it would be entirely reasonable for E*Trade to rely on the knowledge it did possess.

### d. *Loss Causation*

■ The Dolinger Report concludes that E*Trade failed to plead loss causation because its loss resulted from MJK's failure, not from Nomura's fraud. (Report at 26.) However, whether or not MJK's insolvency was one "but for" cause of E*Trade's losses is irrelevant as to whether, as E*Trade alleges, Nomura's scheme directly and proximately caused E*Trade's losses. As previously held, "Loss causation is similar to the tort concept of proximate cause. Thus, 'in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation.'" *Nairobi Holdings Ltd. v. Brown Bros. Harriman & Co.,* No. 02 Civ. 1230, 2002 WL 31027550, 2002 U.S. Dist. LEXIS 16995, at *25 (*quoting Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 195 F.Supp.2d 551, 559 (S.D.N.Y.2002); *Suez Equity Investors, L.P. v. Toronto–Dominion Bank,* 250 F.3d 87, 96 (S.D.N.Y.2002)) (internal citation omitted). *See also Weiss v. Wittcoff,* 966 F.2d 109, 111–12 (2d Cir.1992) (establishing a liberal 12(b)(6) standard for alleging loss causation in an action for fraud). Thus, E*Trade need only show that Nomura's fraudulent acts were a proximate cause of harm suffered. That MJK's collapse was also triggered by fraud strengthens, rather than severs, the causal chain.

E*Trade alleges that Nomura participated in a scheme that inflated the price of GENI shares and ensnared E*Trade in a securities loan transaction, where it would send artificially large sums of cash upstream and then take the fall when the scheme collapsed. E*Trade thus adequately alleges that the scheme was a proximate cause of the harm. *See Epstein v. Haas Sec. Corp.,* 731 F.Supp. 1166, 1184 (S.D.N.Y.1990) (holding that plaintiffs adequately pled loss causation when alleging that defendant was engaged "in a large market manipulation scheme" that induced purchases and "resulted in a substantial decrease in the value of stocks held by plaintiffs"); *accord In re Sterling Foster & Co. Sec. Litig., Inc.,* 222 F.Supp.2d 216, 277 (E.D.N.Y.2002).

Here, unlike in *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.,* 165

F.Supp.2d 615, 625 (S.D.N.Y.2001), cited by Nomura, E*Trades pleads facts that "establish a causal connection between the omission and the injury." In *Emergent Capital*, the plaintiff alleged it would not have entered into a transaction if it had been aware of a defendant's past investment activity, but included little detail and failed to aver any connection between this defendants' past investments and the performance of the stock at issue. *Id.* at 626. The plaintiff thus failed to show that upon eventual disclosure of the defendant's past investment activity to the market, a decline in share price resulted. *Id.* This is in marked contrast to the present case where E*Trade makes detailed allegations regarding the GENI scheme and Nomura's knowledge of it. Furthermore, E*Trade alleges that the collapse of this scheme did indeed cause the price of GENI shares to drop dramatically.

### F. Statements in the Report Will Not Be Stricken as Gratuitous

E*Trade argues that the Report "indulges in two different kinds of statements that are wholly unnecessary and potentially prejudicial to E*Trade" and that "[b]oth should be stricken." (E*Trade's Objections at 20.) First, E*Trade argues that the Report's analysis of its fraud claim is "pure dicta" since the Report directs E*Trade to pursue its fraud claim in Minnesota, where E*Trade was able to file a more thorough complaint and set forth many critical facts that came to light after February 2002. However, as E*Trade itself concedes, an analysis of its fraud claim is necessary for a determination as to its affirmative defenses. In any case the Dolinger Report, denying a motion for leave to amend for failure to state a claim under Fed.R.Civ.P. 12(b)(6), is reviewed *novo* under Rule 72(b). *HCC,* 39 F.Supp.2d at 321. It is thus unnecessary to strike any of the Report's recommendations.

E*Trade further moves to have the Report's statements disparaging it stricken from the record. The Report refers to E*Trade "drag[ging] its feet in providing discovery" and to E*Trade's "game plan" of delay. (Report at 29, 30 n. 5.) As noted above, this case has been marked by considerable delay and much of it through no fault of the parties and to their detriment. However, Magistrate Judge Dolinger's description of the parties conduct during discovery remains part of the record.

### Conclusion

For the reasons set forth, Nomura's motion for summary judgment is granted in part and E*Trade's objections to the Dolinger Report are sustained in part. E*Trade is granted leave to amend its pleadings to add the affirmative defenses of illegality and fraudulent inducement and a fraud counterclaim. Statements in the Dolinger Report will not be struck as "gratuitous." A pretrial conference will be held to consider further scheduling on September 17, 2003 or such other date as the Court and counsel may agree.

Enter judgment on notice.

It is so ordered.